**In re MONROE WELL SERVICE, INC. (Jointly administered with Metro Pipe and Supply Co., Inc., No. 86–02013F; Evergreen Oil & Gas, Inc., No. 86–02014F; Tullos Group, Inc., No. 86–02015F and SSM (A Pennsylvania Partnership), No. 86–02016F), Debtors.**

**Bankruptcy No. 86–02012F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 10, 1987.

Robert J. Hoelscher, Drinker, Biddle & Reath, Philadelphia, Pa., for objector, Voest–Alpine Trading USA Corp.

Leon S. Forman, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for Continental Bank.

Robert H. Levin, Gary D. Bressler, Adelman Lavine Gold & Levin, Philadelphia, Pa., for debtors, Monroe Well Service, Inc., et al.

Michael A. Bloom, Bryna L. Singer, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for the Official Committee of Ltd. Partnerships.

C. Warren Trainor, Ehmann & VanDenbergh, Philadelphia, Pa., for Official Committee of Unsecured Creditors.

J. Scott Victor, Lashner, Victor & Maschmeyer, Philadelphia, Pa., for objectors, James Drilling Co., Inc., James R. McCoy Associates Engineers, et al.

John S. Estey, Natalie D. Ramsey, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., to Sheldon S. Somerman.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Various creditors have objected to the disclosure statement submitted by the debtor and other plan proponents[1] in this complex chapter 11 bankruptcy case. In accordance with 11 U.S.C. § 1125(b) and Bankr.R. 3017, a hearing was held to consider various objections including the adequacy of information provided by the disclosure statement. After considering the arguments offered by the many counsel who participated at the hearing, I will sustain the objections raised in small part. Many of the objections are considered more appropriately at a confirmation hearing, and so will be deferred. I will grant the plan proponents leave to amend their disclosure statement to meet certain concerns raised by the objections. In addition, the plan proponents may wish to alter further both the plan and the disclosure statement. While I will not mandate such further amendments, the plan proponents may well conclude that confirmation may be better achieved, certainly at less expense, if such additional amendments were made.

### I.

The heart of the current dispute is an amended disclosure statement 86 pages long, with approximately 50 additional pages of attachments detailing information about the debtors and about the third amended joint plan of reorganization. This plan is 76 pages long. The length and complexity of these documents stem more from their objectives and ambition than from the structure of debtor-creditor relationships. In order to understand the objections posed by certain creditors, it is necessary, at the obvious risk of oversimplification, to summarize the disputes underlying this chapter 11 case as well as certain provisions of the proposed plan and disclosure statement.

There are five interrelated debtors in the case at bench: Monroe Well Service, Inc.; Metro Pipe and Supply Co., Inc.; Evergreen Oil and Gas, Inc.; Tullos Group, Inc.;

---

**1.** These other plan proponents are official creditors' committees and Sheldon S. Somerman.

and SSM (A Pennsylvania Partnership). All of these debtors are controlled by one principal, Sheldon S. Somerman. In April 1986, these five entities filed voluntary petitions in bankruptcy and were ordered jointly administered. Bankr.R. 1015(b). The impetus for their bankruptcy filings was the steep decline in world oil prices during the 1980's. The overall business purpose of these related entities was to find investors willing to enter into limited partnerships in oil drilling ventures. Once the limited partnerships were formed, Monroe Well Service would undertake oil exploration, drill stripper oil wells in four different states, and maintain and operate the wells. The other debtors would provide equipment, own some wells, and act as a general partner in the limited partnerships; however, the majority of the mineral rights and working interests in the oil wells were owned by nondebtor entities such as the limited partnerships. The debtor's income was derived largely from its drilling operations and its monthly charges for well maintenance. When oil prices declined, so did drilling operations. Left with well maintenance fees as their major source of income, the debtors sought bankruptcy protection from various groups of creditors including several lending institutions.

The debtors' financial problems had significant consequences for those financially connected to the debtor entities. For example, various lending institutions, such as Continental Bank, were involved in financing the debtors' operations. Not only were loans not repaid, but Continental Bank found itself the target of a multimillion dollar lawsuit brought by a class of individuals who were limited partners in the Monroe oil ventures. *Davies et al. v. Continental Bank*, C.A. No. 86–6508 (E.D.Pa.). This same class of limited partners also brought suit against broker-dealers who had been involved in selling the limited partnerships. *Waxman et. al. v. Shearson, Lehman Bros. Inc.*, C.A. No. 86–7516 (E.D.Pa.).

Mr. Somerman himself did not escape unnoticed by disgruntled creditors. For example, an involuntary bankruptcy petition was filed against him;[2] moreover, he allegedly served as guarantor of various corporate obligations and some creditors are anxious to collect on those guarantees.

Total claims in the jointly administered Monroe bankruptcies easily exceed $50 million and may well be more than twice that amount. Apparently $12.5 million of these claims are held by "M & M lien creditors". These creditors are entities who were mechanics or materialmen involved with the drilling and construction of some of the thousands of wells (and well sites) drilled by Monroe for various limited partnerships. State law provisions permit these M & M lien creditors to assert lien claims against both the oil plus the proceeds from the sale of such oil, from those wells which they helped to drill or construct. As I noted earlier, of the 3400 wells drilled by Monroe, relatively few are actually owned by the debtors. In most instances, the mineral rights or working interests are owned by the limited partnerships (or financial institutions). Therefore, these M & M lien creditors are unsecured creditors of the debtors but secured creditors of nondebtor parties such as various limited partnerships.[3] These limited partnerships have themselves asserted millions of dollars of unsecured claims against the debtors.

In their disclosure statement, the debtors assert that all or virtually all of their assets are encumbered by liens and their total unencumbered assets do not exceed $100,000.00. Given that administrative expenses alone exceed $100,000.00 by many multiples, one would envision either a sim-

---

2. No order for relief has yet been entered against Mr. Somerman. It appears that the petitioning creditors are content, as is Mr. Somerman, to await developments in the corporate bankruptcy cases before litigating the propriety of an involuntary bankruptcy case. *See generally* 11 U.S.C. § 303.

3. I enjoined attempts by a few of the M & M lien creditors to execute against the oil proceeds. *In re Monroe Well Service*, 67 B.R. 746 (Bankr.E.D. Pa.1986), *aff'd.* C.A. 86–3656, 3867, 4335 (E.D.Pa. April 15, 1987). This injunction had the support of the official committee of unsecured creditors which is also a plan proponent in the matter.

ple liquidating chapter 11 plan, *but see* 11 U.S.C. § 1129(a)(9); Epling, *Proposal For Equality of Treatment for Claims in Chapter 7 and Claims in a Liquidating Chapter 11 Case,* 4 Bankr.Dev.J. 399 (1987), or conversion to chapter 7. Either approach would result in little or no dividend for unsecured creditors. However, Continental Bank, the official committee of limited partnerships and Somerman have joined forces in an attempt to resolve most, if not all, of their respective disputes surrounding the affairs of these debtors, within the context of these chapter 11 bankruptcies. They have proposed a plan which, upon confirmation, is designed to put an end to various claims and litigation involving nondebtors.

Continental, which technically is not a plan proponent (by choice), will, as part of a proposed settlement of the district court lawsuit against it, pay $6.45 million to plan proponents for distribution; the limited partnerships propose to pay $900,000.00 into the plan from an escrow fund established by an order of this court; and Somerman (or the Somerman group[4]) will pay $145,000.00 into the plan. The debtors proposed to pay $100,000.00 which is also located in an escrow fund. The distribution schemes are complex because of a desire by each plan funder to obtain releases from creditors of the debtors and from other plan funders.

Initially, by virtue of an earlier proposed plan, the plan funders sought to obtain discharges from any obligation they may have owed to creditors of these debtors. When various creditors brought to their attention the provisions of 11 U.S.C. § 524(e), *see e.g., Underhill v. Royal,* 769 F.2d 1426 (9th Cir.1985); *In re Sago Palms Joint Venture,* 39 B.R. 9 (Bankr.S.D.Fl. 1984), the plan funders altered course.

Relying, in part, upon the holding of *In re AOV Industries, Inc.,* 792 F.2d 1140 (D.C.Cir.1986), the plan funders have proposed an amended plan with the following key provisions: All unsecured creditors of the debtor are placed into one class for voting purposes (here, class 9); however, depending upon the type of creditor, each creditor may choose to opt into one or more voluntary nonvoting classes (i.e. classes 7, 8, and 10). The funds provided by the nondebtor funders would be distributed only to members of the optional classes by various formulae. In return for receiving these funds, opting creditors must give releases to the plan funders. Whether or not they choose to participate in the optional classes, creditors in class 9 will share in the distribution of the $100,000.00 provided by the debtors.

There are other plan provisions, such as substantive consolidation, which have caught the eye of some creditors, but which need not be discussed in detail here. However, the results of the confirmation of the plan should be noted. Continental Bank, which asserts a secured claim exceeding $24 million, will end up controlling the stock of a new corporation called Monroe (Delaware), consisting of assets from the consolidated debtors; it will not receive any other distribution from the estate but will obtain releases. M & M lien creditors who elect to participate would receive approximately 30% payment on their claims. Limited partnerships may elect to be free of M & M liens and to share in a $1 million trust fund designed to help preserve their oil well investment. Other electing unsecured creditors would receive approximately 7% payment on their claims. Of course, non-electing creditors would only receive .4% distribution, but would retain their rights against the nondebtors.

## II.

The objectors and their objections to this disclosure statement fall into two categories. Virtually all of the objecting creditors are M & M lien claimants with one exception: Voest–Alpine Trading, U.S.A. Corporation ("VATCO"), which allegedly holds a claim guaranteed by Mr. Somer-

---

**4.** Apparently, the Somerman empire consists of more than just the debtor companies. In the proposed plan, the Somerman group is defined as: The Somerman Companies, Metro Care, Inc., Cahan, Somerman and Spewak Partnership and present and former partners of SSM. *See* Third Amended and Restated Joint Plan of Reorganization at 10.

man. The objections raised are either informational—the disclosure statement does not provide "adequate information", *see* 11 U.S.C. § 1125(a)—or structural—the disclosure statement accurately describes a plan of reorganization which could not possibly be confirmed because it violates 11 U.S.C. § 1129. I will discuss the informational objections first.

### A.

The primary purpose of a disclosure statement, which is mandated by 11 U.S.C. § 1125, is to give creditors the "adequate information" necessary for them to decide whether to accept a proposed plan. *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir.1985); *In re Stanley Hotel, Inc.*, 13 B.R. 926 (Bankr.D.Colo.1981). Sufficient financial information must be provided so that a creditor (likened to a "hypothetical reasonable investor") can make an "informed judgment" whether to accept or reject the plan. *In re Jeppson*, 66 B.R. 269, 289 (Bankr.D.Utah 1986); *In re Civitella*, 15 B.R. 206 (Bankr.E.D.Pa.1981); *In re Northwest Recreational Activities, Inc.*, 8 B.R. 10 (Bankr.N.D.Ga.1980).

The legislative history surrounding the passage of § 1125 not only clearly sets forth its purpose but also emphasizes that the adequacy of disclosure is dependent upon various factors including: the size and complexity of the chapter 11 case, the type of plan proposed, the type of creditors and claims impaired by the proposed plan, and the access by impaired creditors to relevant information from other sources.

In consolidating the two reorganization chapters, it is necessary to determine the extent of the disclosure to creditors and equity security holders required, and the extent of advance court determination of the propriety of the plan. The premise underlying the consolidated chapter 11 of this bill is the same as the premise of the securities law. If adequate disclosure is provided to all creditors and stockholders whose rights are to be affected, then they should be able to make an informed judgment of their own, rather than having the court or the Securities and Exchange Commission inform them in advance of whether the proposed plan is a good plan. . . .

That section defines the phrase "adequate information" as the standard for disclosure in a reorganization case. This standard, which is flexible on a case-by-case basis, governs the disclosure that must be provided in all reorganization cases, whether involving a public or private corporation, or a partnership or an individual debtor. The subsection defines adequate information as—

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.

The flexibility in the standard comes primarily in the use of the phrase "investor typical of holders of claims or interests of the relevant class." That phrase is further defined to develop the idea that the disclosure required depends on the circumstances of the case, the relative sophistication of the creditors, and their access to other sources of information about the plan. For example, trade creditors will not need the same level of disclosure as public debenture holders or stockholders, and the section reflects the desired flexibility. The section also permits a certain amount of flexibility based on the condition of the debtor and of his books and records. Frequently, the debtor's books will be in shambles at the time of bankruptcy, and reconstruction could be a long and costly process. If there is no need for the information under the circumstances, reconstruction may be dispensed with, and certified audited financial statements will not be required. Such a requirement in every case could doom many reorganizations to failure.

. . . .

The disclosure section permits the disclosure required to different classes to differ in amount, detail, or kind, but re-

quires the disclosure to each member of a particular class to be the same. This provision permits flexibility in the preparation and distribution of disclosure statements. It may be used, for example, where a very large class required only limited disclosure, while other classes required more extensive disclosure. To save preparation, printing, and mailing costs, it might be appropriate to send different statements to the different classes. On the other hand, in many cases, it will be a cheaper matter to send the most complete disclosure statement to all classes, instead of attempting to prepare separate ones.

H.R.Rep. 95–595 95th Cong. 1st Sess. at 226–227 (1977) U.S.Code Cong. & Admin. News 1976, pp. 5787, 6185, 6186 (footnotes omitted).

It is clear that Congress intended for bankruptcy judges to exercise a great deal of discretion when considering the "adequacy of information" provided by a disclosure statement. *In re Stanley Hotel, Inc,* 13 B.R. at 930. In exercising that discretion here, I am mindful that the proposed disclosure statement is already extremely lengthy; I also recognize that a disclosure statement may provide different types of information to different classes of creditors. As a result, some courts have limited a creditor's standing to object to a disclosure statement only to those matters which affect the ability of that creditor to exercise, meaningfully, its right to vote on the plan. *See In re Adana Mortgage Bankers, Inc.,* 14 B.R. 29, 30 (Bankr.N.D.Ga.1981). Moreover, the key issue for unsecured creditors in this case is not whether there exist unencumbered assets of the debtors sufficient to provide any measurable distribution. Given the size of administrative and other priority claims as well as the total amount of unsecured claims, there is little possibility of that occurring.[5] Rather, the crucial matters concern what the plan proposes that creditors relinquish by way of claims against nonstate assets, what the plan proposes to pay creditors and how claims are classified. Thus, it is not surprising that the objectors are largely M & M lien creditors who can look to nonstate assets for payment.

■ Turning to the informational objections of these creditors set out in paragraph 27 of their pleading, to the extent they request a liquidation analysis for the debtors, I conclude that the disclosure statement already provides adequate information in this regard. Not only does the statement disclose the amount of unencumbered assets, the amount of priority claims, and the result of a hypothetical liquidation to unsecured creditors, but it also attaches two combined balance sheets for all of the debtors. One balance sheet is dated April 23, 1986, when these bankruptcy cases were commenced, and the other is dated May 23, 1987. These two balance sheets, coupled with the monthly operating reports filed by the debtors pursuant to L.B.R. 2015.1 make a liquidation analysis, in the context of this disclosure statement, unnecessary.[6] *See In re A.C. Williams Co.,* 25 B.R. 173, 175 (Bankr.N.D.Ohio, 1982) (book value information is sufficient); *In re East Redley Corp.,* 16 B.R. 429, 430 (Bankr.E.D. Pa.1982) (valuation is not required).

■ Similarly, there is no need for additional disclosures regarding unpaid accounts receivable beyond that already provided in the statement and the attached balance sheets. This asset is encumbered and the proposed plan would be unaffected by the collection of this asset.[7] However, there are three assets listed in the balance sheet as of the commencement of the case about which creditors are entitled to learn more. These assets—loans to partnerships; investment in partnerships; and capitalized farm out costs—had a combined book value exceeding $21 million in April

---

**5.** What little possibility may exist concerns three types of assets discussed *infra.*

**6.** This is not to say that valuation testimony would not be necessary if confirmation is sought under 11 U.S.C. § 1129(b).

**7.** Because substantive consolidation is sought, the objectors are correct in seeking additional information about inter debtor accounts receivables. The statement should be amended to include this information.

1986 yet do not appear as assets on the combined balance sheet in May 1987. The creditors request and should receive additional information about the current value of the assets, whether they were encumbered, whether they were distributed postpetition (and, if so, to whom), and whether they are to be distributed under the proposed plan.

■ The objectors also claim that more information is needed about the officers, and directors of the proposed new entity Monroe (Delaware) and cite 11 U.S.C. § 1129(a)(5)(A) in support of their position. This new entity is to be controlled by Continental Bank which, at the disclosure statement hearing, assured all creditors that Mr. Somerman would have no involvement in Monroe (Delaware). At this point, I decline to decide whether Monroe (Delaware) is the successor to the debtor(s), *see generally In re Stanley Hotel, Inc.;* there was no evidence offered on this issue. Thus, I will defer ruling upon this matter until the confirmation hearing.

■ Finally, the objecting creditors claim they are entitled to additional information in two other areas. First, they note that the proposed plan provides that the nondebtor plan funders require, as a condition precedent to funding, that various percentages of unsecured creditors opt to provide releases. *See Third Amended and Restated Joint Plan of Reorganization,* at 29–33. These conditions should be disclosed in the statement. *See In re Fierman,* 21 B.R. 314 (Bankr.E.D.Pa.1982) (disclosure statement should detail matters affecting plan funding). Second, both the M & M lien creditors and VATCO seek addi-

tional financial information about Mr. Somerman. VATCO argues that it cannot assess the value of its guarantee without this information and the M & M creditors argue [8] that they need some assurance that Somerman has the funds which he must provide under the proposed plan. While the M & M creditors position is weak, VATCO's argument is sensible. Thus, additional financial information about Somerman must be included in the disclosure statement so that creditors may value the worth of their guarantees.[9]

■ When a disclosure statement does not provide adequate information bankruptcy courts have the discretion to permit needed amendments to be made rather than simply to deny approval. *See In re Stanley Hotel, Inc.; In re East Redley Corp.* The plan proponents here expended much effort and demonstrated considerable ingenuity in preparing the proposed plan and disclosure statement. With relatively little additional information, the disclosure statement will provide adequate information to all creditors. They deserve this opportunity to amend the statement and upon amendment to reapply for approval from this court.

### B.

■ To varying degrees, all parties wish me to address certain objections which would normally be considered at a confirmation hearing rather than at a hearing to approve a disclosure statement. The objecting creditors argue that the proposed plan is so flawed that it could not possibly be confirmed and invoke judicial economy concerns; the plan proponents obviously disagree that their plan is flawed but agree

---

**8.** The objectors also refer to Mr. Somerman's own bankruptcy, and question whether he can contribute any funds to corporate creditors. Since there is no order for relief in his case, he is not constrained by his own bankruptcy proceeding. 11 U.S.C. § 303(f).

**9.** Somerman argues that such disclosure is not sought from any other plan funder but him and is thus unfair. He overlooks that there need not be uniformity in disclosure to all classes of creditors. *See* 11 U.S.C. § 1125(c). He also overlooks that the creditors already know much about the debtors' finances and that extensive

oil reserve studies have been undertaken detailing the worth of wells owned by the limited partnerships. These studies were made available to the M & M lien creditors. Of the plan funders, little is known only of Somerman's finances and those of Continental Bank. Apparently those who are being enticed to release Continental Bank are confident that they can value what they would be relinquishing without additional information. As Mr. Somerman is not a financial institution, those from whom he seeks a release have no information to tell them whether their guarantees have value.

that a ruling on some of the objections would spare someone, (here, not the allegedly impecunious estate), the expense of mailing a disclosure statement and preparing for and participating in a confirmation hearing which may be for naught. I agree that, occasionally, it may be appropriate to disapprove of a disclosure statement, even if it properly summarizes and provides adequate information about a proposed plan, when a court is convinced that the plan could not possibly be confirmed. *In re Pecht,* 57 B.R. 137 (Bankr.E.D.Va.1986); *In re McCall,* 44 B.R. 242 (Bankr.E.D.Pa. 1984); *In re Kehn Ranch, Inc.,* 41 B.R. 832 (Bankr.S.D.1984). Such action is discretionary and must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing, and to insure that due process concerns are protected.[10] Furthermore, the objections considered must be limited to defects which could not be overcome by creditor voting results and must also concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.

■ Here, the objecting M & M lien creditors raise a multitude of objections that the proposed plan violates different provisions of § 1129(a) and (b). They argue, *inter alia:* that substantive consolidation should not be permitted; that the absolute priority rule is violated; that the best interests of creditors test is not met; that creditors are improperly classified; that similar creditors are receiving disparate treatment; that the distribution of nondebtor funds is not uniform; that the claim of Continental Bank must be subordinated pursuant to 11 U.S.C. § 510; and that a plan cannot provide for voluntary releases. VATCO also argues that 11 U.S.C. § 1123(a)(4) is violated in that creditors of the same class are receiving disparate treatment.

Virtually all of the objections raised cannot be considered at this juncture in the case. Depending upon the voting of various classes, the debtors may not be seeking confirmation under § 1129(b); thus, there is no need at this point to address the absolute priority rule or the best interest of creditors test, other than to hold that these concepts are properly explained in the disclosure statement. Similarly, no testimony was offered that would permit me to determine the equitable issues surrounding substantive consolidation, *see e.g. In re F.A. Potts & Co., Inc.,* 23 B.R. 569 (Bankr.E.D. Pa.1982); *In re Snider Bros, Inc.,* 18 B.R. 230 (Bankr.D.Mass.1982), or the subordination of claims. *See e.g. In re N & D Properties, Inc.,* 799 F.2d 726 (11th Cir. 1986); *In re Missionary Baptist Foundation, Inc.,* 712 F.2d 206 (5th Cir.1983); *In re Ludwig Honold Manufacturing Co.,* 46 B.R. 125 (Bankr.E.D.Pa.1985).

In fact, it is not possible for me to determine at this point what distributions will be made to various classes let alone to individual creditors. Depending upon the votes and elections of creditors, some or all of nondebtor plan funders may not choose to participate in the implementation of the plan. Since virtually all of the structural objections were dependent upon the distributions to be made to creditors, I must defer ruling upon those objections until the confirmation hearing.

All parties, though, apparently believe that the question whether a plan of reorganization can provide for voluntary releases of nondebtors is ripe for a determination at this point. They view this dispute as purely a legal issue that is both capable of being addressed now and that, in the interest of economy, should be addressed. The issue has been fully briefed by all parties, as well as argued, and goes to the very heart of this proposed plan. Moreover, as I will discuss below, this issue is somewhat connected with the question of claim classification which can be addressed prior to a confirmation hearing. Bankr.R. 3013. Therefore, I will attempt to resolve some of the questions posed by this one objection to this unusual plan of reorganization.

**10.** The disclosure statement itself is not mailed to all creditors until after court approval is obtained, *see* 11 U.S.C. § 1125(b) and Bankr.R. 3017(a); and plan proponents must be placed on notice that § 1129 issues may be considered.

### III.

In *In re AOV Industries, Inc.*, 792 F.2d 1140 (D.C.Cir.1986), the Court of Appeals upheld, in part only, an order confirming a plan of reorganization which provided for voluntary releases by creditors in favor of nondebtor plan funders. In the matter *sub judice*, the plan proponents have attempted to devise a plan similar to that confirmed in *AOV Industries* and which would comport with the limitations imposed by 11 U.S.C. § 524(e). The objectors argue that *AOV Industries* was wrongly decided and should not be followed. I conclude that *AOV Industries* correctly interpreted 11 U.S.C. 1129(a); however, while I cannot be certain based upon the record before me, it may well be that the proposed plan in question here does not meet the requirements of 11 U.S.C. § 1123(a)(4) as defined by *AOV Industries*.

### A.

■■■■ In a chapter 11 case, as opposed to chapter 13, the debtor receives its discharge as to all of its debts, as defined by 11 U.S.C. § 524, upon entry of the order of confirmation. 11 U.S.C. § 1141(d)(1).[11] *See e.g. In re N.S. Garrott & Sons*, 48 B.R. 13, 16 (Bankr.E.D.Ark.1984). The provisions of the confirmed plan bind all creditors whether or not a particular creditor has voted to accept the plan. 11 U.S.C. § 1141(a). *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987); *In re Northampton Corp.*, 37 B.R. 110 (Bankr.E.D.Pa.1984). *See generally, In re Jeppson.* Since confirmation may be achieved over the dissent of individual creditors, *see* 11 U.S.C. § 1126, and even over the objection of an entire class of creditors, 11 U.S.C. § 1129(b); *accord In re Jeppson*, 66 B.R. at 287, a debtor's discharge may be obtained over the objection of a particular creditor. *See Union Carbide Corp. v. Newboles*, 686 F.2d 593 (7th Cir.1982).

■ 11 U.S.C. § 524(e) is designed to limit the effect of this discharge. It states:

(e) Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.[12]

Based upon this provision, I agree with the objectors that the debtors here could not obtain confirmation of a plan which would attempt, over their objection, to discharge the obligations of nondebtors, such as guarantors. *See Underhill v. Royal*, 769 F.2d 1426 (9th Cir.1985); *R.I.D.C. Industrial Development Fund v. Snyder*, 539 F.2d 487 (5th Cir.1976) *cert. denied* 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977) (interpreting the Bankruptcy Act predecessor of § 524(e)). *See also Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (issues raised by § 524(e) must be noted prior to confirmation as a final and unappealed order of confirmation may, by virtue of *res judicata*, discharge a guarantor, if the plan so provides).

■ As with the plan here, the plan in *AOV Industries* made no attempt to release any claim held by a creditor against a nondebtor over the wishes of that individual creditor. Each creditor was permitted to render an individual decision whether to provide a release to a nondebtor in return for payment provided by a nondebtor plan funder. In *AOV Industries*, the District Court concluded that, so long as the release is purely voluntary and the will of the majority of creditors cannot force dissenting creditors to provide releases, *compare Union Carbide v. Newboles*, the nondebtor plan funders will not receive a discharge and the debtor's discharge did not, by itself, affect the rights of creditors *vis-a-vis* those plan funders. *In re AOV Industries, Inc.*, 31 B.R. 1005, 1010–11 (D.D.C. 1983) *aff'd in part* 792 F.2d 1140 (D.C.Cir. 1986).[13] I agree; a plan provision permitting individual creditors the option of pro-

---

**11.** Of course, there are important exceptions to this principle which are set out in § 1141(d)(2), (3).

**12.** The exception provided by § 524(a)(3) has no relevance to the matter at bench.

**13.** Of course, the absence of a creditor majority may result in a denial of confirmation. But this denial of confirmation would not affect the rights of creditors against third parties.

viding a voluntary release to nondebtor plan funders does not violate 11 U.S.C. § 524(e).[14]

### B.

In partially reversing the District Court, the District of Columbia Court of Appeals held that even the voluntary release provisions of a plan must also meet the requirements of 11 U.S.C. § 1123(a)(4),[15] which states:

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—
>
> .    .    .    .    .
>
> (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

In *AOV Industries*, the Court of Appeals concluded that equality of treatment of members of a class is not provided simply by permitting each creditor of that class to opt to provide a release and receive the same pro rata distribution on its claim. Instead, it noted:

> Even though neither the Code nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when

members of a common class are required to tender more valuable consideration— be it their claim against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery.

792 F.2d, at 1152.

Of course, the Court of Appeals also held that equality of treatment could be achieved by approximate and imprecise measures; there was no statutory obligation upon plan proponents to quantify precisely what each class member was relinquishing. Equality of treatment thus becomes a matter of degree, not one of mathematical exactitude:

> We do not hold that all class members must be treated precisely the same in all respects. Nothing in this opinion restricts the bankruptcy court's broad discretion to approve classification and distribution plans, even though some class members may have disputed claims, or a stronger defense than others.

*Id.*, at 1154.

█ All of the objecting creditors, including VATCO, contend that the proposed plan violates the equality of treatment requirement of § 1123(a)(4). They argue that certain creditors, particularly limited partnership creditors, are receiving more than other unsecured creditors, and request that I reject the disclosure statement on this basis. At this point, I am reluctant to sustain this objection since it is impossible for me to determine, even in an imprecise way, the amount a particular creditor will receive under the plan. Indeed, as the objectors themselves understand, the con-

---

**14.** The Court of Appeals decision in *AOV Industries* was recently cited with approval by the Court of Appeals of this circuit for a different proposition. *Matter of Jersey City Medical Center*, 817 F.2d 1055, 1061 (3d Cir.1987):

> Accordingly, we agree with the general view which permits the grouping of similar claims in different classes. *See In re U.S. Truck Co., Inc.*, 800 F.2d [581] at 587 [ (6th Cir.1986) ]; *Matter of LeBlanc*, 622 F.2d 872, 879, *reh'g denied*, 627 F.2d 239 (5th Cir.1980); *Barnes v. Whelan*, 689 F.2d 193, 200–01 (D.C.Cir.1982). *See also In re AOV Industries, Inc.*, 792 F.2d 1140, 1150 (D.C.Cir.1986) (requiring an objecting creditor to show not only that similar claimants appear in different classes, but also

that those in its class have disparate claims); 5 *Collier on Bankruptcy* ¶ 1122.03[1][b] at 1122–7 ("does not require that all claims that are substantially similar be placed in the same class").

Without now passing upon the matter, the above quoted holding may dispose of certain objections raised by M & M lien creditors concerning the classification of and distribution to creditors in class 5, (the FDIC), and class 6 (the "Shreveport Group").

**15.** This subsection is brought into the confirmation process by virtue of 11 U.S.C. § 1129(a)(1). *See e.g. Matter of Johns–Manville Corp.*, 68 B.R. 618, 629–30 (Bankr.S.D.N.Y.1986).

tributions of the different nondebtor funders seem contingent upon the outcome of future voting by creditors. Therefore, I will defer a ruling on this issue until a confirmation hearing is held. I must note, though, that the plan proposal here is significantly different in one respect from that approved in *AOV Industries* and that this difference gives strength to the position taken by the objectors.

In *AOV Industries*, all unsecured creditors were placed in one class and each member of that class was given the option of tendering a release and receiving the same percentage distribution from nondebtor plan funders. *In re AOV Industries*, 31 B.R. at 1008–1009. In the matter at bench, the distributional scheme is quite different. Certain unsecured creditors, such as M & M lien creditors, have the right to opt into class 7, which is a nonvoting class. Other unsecured creditors, the limited partnerships, may opt only into class 10, another nonvoting class. And some unsecured creditors can only opt into class 8, also a nonvoting class. The distribution to be provided as to class 7 members seems quite different from that provided to class 10 members, which in turn is different from that provided to class 8 members. The objecting creditors here are potential class 7 and 8 members who contend that class 10 members receive a much greater benefit under the plan than they do.

▨ Plan proponents have some leeway in classifying claims. While "the classification of claim or interests must be reasonable", similar claims, such as unsecured claims, may be grouped into different classes. *Matter of Jersey City Medical Center*, 817 F.2d at 1061. *Accord e.g. Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310 (8th Cir.1987). The equality of treatment provision of § 1123(a)(4) only applies as to claims placed in the same class. *Matter of Jersey City Medical Center*, 817 F.2d, at 1061. Taken together, these principles lead to the result that similar claims, classified differently, may validly receive different treatment under a chapter 11 plan. I suspect that those in favor of the proposed plan intend to argue at a confirmation hearing, in response to this objection, that there is no need to demonstrate that class 7 members are being treated equally with class 10 members; rather, the argument will be that all class 7 members are being treated equally.

▨ The difficulty with accepting this argument is that one must also accept the concept of applying § 1123(a)(4) to a class which is, by any measure, impaired, and which is not permitted to vote. If a class is unimpaired, as defined by § 1124, then its members do not vote on the plan for each is conclusively presumed to accept the plan. 11 U.S.C. § 1126(f). If a class is impaired, then its members have the absolute right to vote. This right to vote is a crucial component of the complex balancing of interests embodied in the provisions of chapter 11. *See In re Jeppson*, 66 B.R. at 294.

No party has addressed the issue whether a voluntary impaired, nonvoting class is the discrete entity by which one measures equality of treatment. Certainly, *AOV Industries* offers no support for that proposition. It may well be that the decision of the plan proponents to place all unsecured claims into one class, class 9, which was probably made to avoid the rigors of achieving confirmation under the cram down provision of § 1129(b), yields the result that § 1123(a)(4) is applied with reference to members of class 9 only. If so, then all unsecured creditors must be treated the same and class 10 members cannot receive more under this plan than class 7 or class 8 members. Since no one has addressed this question, and since I do not know what any particular creditor will relinquish or receive, I only note the problem; I do not decide it. However, since the plan proponents must amend their disclosure statement in any event and since the confirmation process will be so expensive, they may wish to reconsider their classification decisions.

An appropriate order will be entered.