**In re ORLANDO INVESTORS, L.P., Debtor.**

**Bankruptcy No. 88–11211F.**

United States Bankruptcy Court, E.D. Pennsylvania.

July 28, 1989.

**594**

Robert M. Greenbaum, William M. Lashner, Lashner, Victor & Maschmeyer, Philadelphia, Pa., for objectors, ltd. partners.

Raymond H. Lemish, Myron A. Bloom, Adelman Lavine Gold and Levin, Philadelphia, Pa., for debtor, Orlando Investors, L.P.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Before me is the question of whether the debtor's Second Amended Plan of Reorganization should be confirmed pursuant to 11 U.S.C. § 1129(a). Ten limited partners, acting in concert, have filed objections to confirmation.

## I.

The debtor, Orlando Investors, L.P., was formed in August, 1985 as a limited partnership. Its sole asset is a 260 unit apartment complex known as the "Pacesetter Apartments" which is located in Altamonte Springs, Florida, a suburb of Orlando. The complex was originally built in 1973 and was purchased by the debtor in 1985 for approximately $11,200,000.00. The debtor itself has four general partners and 100 limited partnership interests. The latter was purchased by 85 individuals.

While the debtor was able to remain current with taxing authorities and trade creditors, it soon found itself, after purchasing this realty, unable to pay debt service. There are five liens held against the property by the following entities: New York Life Insurance Co.; McNeil Pacific Investors Fund 1972; Steven M. Rayman; Bound Brook Associates I; and Whitestone Savings, F.A. and Fireman's Insurance Company of Newark, N.J. The debtor attributed its difficulty in repaying these mortgagees to a weakening of the rental housing market in the Orlando area which left it with less income than anticipated.

On April 8, 1988, the debtor filed a voluntary petition in bankruptcy under chapter 11. On November 22, 1988, the objecting limited partners filed a class action lawsuit, under F.R.Civ.P. 23(b)(3), against various defendants including the general partners of the debtor, the accounting firm of Laventhol and Horwath, and Whitestone Savings F.A. and Fireman's Insurance Company of Newark, N.J. This lawsuit, *Berk et al. v. Ascott Investment Corp., et al.,* which was filed in the District Court for the Eastern District of Pa., C.A. No. 88-9000, alleged that the defendants violated state and federal securities laws, breached their fiduciary duties, and also violated the federal RICO statute. No class has yet been certified under Rule 23(c).

The challenged proposed second amended plan is convoluted. For purposes of the instant dispute, it may be summarized as follows: the general partners propose to waive all claims they have against the debtor, make certain payments to various se-

cured creditors, and make a capital contribution to the debtor for improvements to the realty. Administrative creditors, largely attorneys who have rendered services in this bankruptcy case, are to be paid in full over time. Unsecured creditors, of whom there are apparently none, were to be paid in full on the effective date of the plan. Certain secured creditors are to compromise their secured claims. The general and limited partners are to retain their respective interests in the debtor partnership and its asset but receive no other dividend under the plan. This plan is contingent upon 90%[1] of the limited partnership interests voluntarily releasing any claims they may have against the named defendants in the federal lawsuit.

No objections were raised against the debtor's disclosure statement and so it was approved, along with a procedure for voting on the plan. Those votes have been cast and tallied by the debtor as plan proponent. All secured creditors and general partners voted to accept the proposed plan. Approximately 80% of the limited partners voted to accept the plan, and approximately 70% of the limited partnership interests voted to provide voluntary releases in favor of the federal defendants, including the general partners. Although this last sum is less than the 90% called for by the plan, the general partners nonetheless are prepared to advance the funds called for by the plan. Thus, the debtor, who is the plan proponent, seeks an order of confirmation.

In this regard the debtor is opposed by the limited partners who initiated the federal class action. Of course, under the terms of the proposed plan, that lawsuit would continue; however, if the plan is confirmed, many putative class members would no longer be participating, and this reality permeates the instant dispute. The objectors raise three bases for opposing confirmation: first, that the voluntary release provision is invalid; second, that the plan has not been proposed in good faith; and third, that the plan is not feasible. These objections shall be discussed in turn.

## II.

I had occasion to discuss the concept of creditors (or equity security holders such as limited partners, 11 U.S.C. § 101(15)(B)) providing voluntary releases of claims against non-debtors as part of a chapter 11 plan of reorganization in *In re Monroe Well Service, Inc.*, 80 B.R. 324 (Bankr.E.D. Pa.1987). The goal of such releases is to circumvent, in a legitimate fashion, the limitation on the reach of the bankruptcy discharge as established by 11 U.S.C. § 524(e).[2] *Id. See also Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir.1988) (confirmed plan calls for the creation of a trust and an injunction against proceeding directly against the debtor by future asbestos victims whether or not such individuals are considered "creditors" with claims discharged by virtue of § 524). As noted by the Court of Appeals for the District of Columbia in *In re AOV Industries, Inc.*, 792 F.2d 1140 (D.C.Cir.1986), *aff'g in part* 31 B.R. 1005 (D.D.C.1983), such a release provision in a plan does not run afoul of § 524(e) because, unlike the injunction created by the discharge of a debt, the majority cannot bind the individual. Rather, the individual may choose, or not, to provide the release irrespective of the vote of the class of creditors or equity holders of which he is a member. *In re Monroe Well Service, Inc.*, 80 B.R. at 334. *Accord, e.g., In re AOV Industries, Inc. See also In re TM Carlton House Partners, Ltd.*, Misc. No. 89–0347, order ¶ 2 (E.D.Pa., June 23, 1989) (Giles, J.). *See generally In re Elsinore Shore Associates*, 91 B.R. 238, 246–52 (Bankr.D.N.J.1988). Obviously, those creditors or equity holders agreeing to provide voluntary releases do so believing that they will be better served by voting to release claims against non-debtors and obtaining

---

1. The plan funders reserved the right to accept a smaller number of voluntary releases. As will be discussed shortly, the 90% goal was not achieved, but the lesser figure which was offered by the limited partners, approximately 70%, is acceptable to the general partners.

2. Under § 524(e), a bankruptcy discharge cannot affect the rights of creditors or interest holders against a non-debtor.

the benefits offered to them by the proposed plan than by retaining those claims.

As the Court of Appeals in *AOV Industries* also explained, though, the release terms of the plan must comply with the provisions of 11 U.S.C. § 1123(a)(4), which are incorporated into the confirmation process by 11 U.S.C. § 1129(a)(1). *See also In re Monroe Well Service, Inc.*, 80 B.R. at 335–36. That means that creditors (or, as here, equity interest holders) of the same class, including limited partnership interests, must receive approximately the same distribution under the plan—that is, there must be equality of treatment. *Id.* Equality in this case depends upon those offering releases receiving a greater distribution than those not tendering releases since they are "contributing" more than simply having their claims against the debtor discharged.

■ The objectors correctly note that the debtor's second amended plan does not treat all interest holders, i.e. limited partners, of the same class equally. All limited partners are placed in class 5. The only distribution that limited partners receive under the plan is retention of their interest in the debtor partnership. This distribution is provided to all limited partners, even those who do not vote to provide releases, so long as a sufficient number tender voluntary releases. Therefore, this plan proposes to give a greater distribution to those limited partners who do not grant releases than to those who do.

The interesting aspect of this dispute is that the only limited partners objecting to confirmation are those who have not tendered voluntary releases. That is, the equity holders who are receiving a greater distribution are the only complainants. Those partners who are to receive less have lodged no objection to confirmation and have voted overwhelmingly in favor of the plan. Therefore the issue arises whether the objectors have "standing" to complain that the distribution provided to their fellow equity holders is too small. I conclude that, here, the objectors lack such standing.

The Supreme Court has explained that the concept of standing, which includes the prohibition of "a litigant raising another person's legal rights," has both constitutional and prudential components. *Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). *See also Frissell v. Rizzo*, 597 F.2d 840 (3d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). Regardless of whether the constitutional concerns emanating from Article III apply to this Article I court, *see In re Weaver*, 632 F.2d 461, 462 n. 6 (5th Cir.1980) (court suggests that the constitutional concerns exist), there is no doubt that the prudential concerns are present. *Fred Reuping Leather Co. v. Fort Greene. Nat'l Bank*, 102 F.2d 372 (3d Cir.1939).

As a result, courts have generally applied the concept of standing when considering proof of claim litigation, *see, e.g., In re Dominelli*, 820 F.2d 313, 317 (9th Cir. 1987); *Kapp v. Naturelle, Inc.*, 611 F.2d 703, 706 (8th Cir.1979); *In re Morrison*, 69 B.R. 586 (Bankr.E.D.Pa.1987), and when considering objections to officer compensation, *see In re Athos Steel & Aluminum, Inc.*, 69 B.R. 515 (Bankr.E.D.Pa.1987). Perhaps more relevant to the instant dispute is the fact that issues of standing have been applied in the chapter 11 confirmation process. As a result, creditors whose rights are unimpaired under the plan, and who therefore have no right to vote on the plan, *see* 11 U.S.C. §§ 1124, 1126(f), have been held to possess no right to object to confirmation. *In re Wonder Corp. of America*, 70 B.R. 1018 (Bankr.D. Conn.1987) (and cases cited). Similarly, creditors have been limited in their right to object to provisions of a proposed disclosure statement to those aspects of the statement which affect the ability of that creditor to meaningfully exercise its right to vote on the plan. *In re Adana Mortgage Bankers, Inc.*, 14 B.R. 29 (Bankr.N.D. Ga.1981).

Courts have even concluded that parties "have standing only to challenge those parts of a reorganization plan that affect their direct interests." *In re Evans Products Co.*, 65 B.R. 870, 874 (S.D.Fl.1986).

*Accord, In re Fondiller,* 707 F.2d 441 (9th Cir.1983); *In re Sweetwater,* 57 B.R. 743 (D. Utah 1985). *See also Matter of Johns–Manville Corp.,* 68 B.R. 618, 623 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y. 1987) ("no party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation."). This conclusion was recently enforced in *Kane v. Johns–Manville Corp.*

Here, the objecting partners are contributing no funds toward confirmation, are releasing no non-debtor parties, and are retaining their limited partnership interests in full. Any distributional faults in the proposed plan concern the releasing limited partners, and they do not object to confirmation. Therefore, it is difficult to see how the rights of the objectors have been adversely affected by the inequality of treatment proposed by this plan, and difficult to accord them standing to raise this issue.

To support their standing, the objectors point to 11 U.S.C. § 1109(b).[3] Clearly, this subsection was designed to insure that all who have a sufficient stake in the outcome of a proceeding be heard. *See In re Amatex Corp.,* 755 F.2d 1034, 1042 (3d Cir. 1985); *In re Public Service Co. of New Hampshire,* 88 B.R. 546, 550–551 (Bankr. D.N.H.1988). Equally clearly, equity holders have the right to be heard on the question of confirmation. It does not follow, though, that the statutory right to be heard on an issue includes the right to assert interests possessed solely by others.[4] *See Kane v. Johns–Manville Corp.* Thus, to the

extent that Congress is not constitutionally barred from altering traditional standing concepts in chapter 11 proceedings, it is unlikely that it did so in enacting § 1109(b). *See generally In re Wonder Corp. of America; Matter of Johns–Manville Corp.*

This conclusion is especially valid on the issue of equality of treatment. While section 1123(a)(4) mandates equality within classes, *see Matter of Jersey City Medical Center,* 817 F.2d 1055, 1061 (3d Cir.1987), it does so with the caveat: "unless the holder of a particular claim or interest agrees to less favorable treatment."[5] In this instance, many limited partners have agreed to receive less than equality of treatment.

The proposed plan never required that all limited partners tender releases; thus, those that have voted to tender a release did so with the knowledge that, if this plan were confirmed, they would receive a smaller distribution than those who refused to grant releases. The objectors have no basis to complain that such generosity is inappropriate for each releasing limited partner who will receive less than the non-releasing partners did so voluntarily. Therefore, the standing principles which flow from §§ 1109(b) and 1123(a)(4) preclude the objectors from challenging the effect of the voluntarily releases upon confirmation.

Finally, the objectors argue that the existence of the class action suit in district court grants them the right to challenge the plan's failure to provide equal treatment to all limited partners. They reason that even though no class has yet been

---

**3.** This subsection states:
(b) A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter. Pub.L. 95–598, Nov. 6, 1978, 92 Stat. 2629.

**4.** The objectors' reliance upon *Matter of Marin Motor Oil, Inc.,* 689 F.2d 445 (3d Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983) is misplaced. The Court of Appeals held only that an official unsecured creditors' committee had a statutory right to participate in an adversary proceeding, the outcome of which might affect its constituency's interests. It did

not hold that the committee could assert the interests held by parties who were not unsecured creditors.

**5.** This provision is but one of a number found within the Code which allows creditors and equity holders to voluntarily accept less than that to which they are entitled. *E.g.,* 11 U.S.C. §§ 363(c) (secured creditor may permit use of cash collateral without adequate protection); 1129(a)(7) (a creditor class may vote to accept a distribution which is less than they would receive under a chapter 7 liquidation); 1129(a)(9) (a holder of a priority claim may agree to receive less than full payment on the effective date of the plan).

certified the lawsuit must be treated as a class action pending certification. *See Inglewood v. Los Angeles,* 451 F.2d 948 (9th Cir.1971); 3B *Moore's Federal Practice,* ¶ 23.50, at 23–396 to 97 (2d ed. 1988). As such they contend that they are class representatives entitled to protect the interests of class members; moreover, the objectors argue that the proposed plan is an attempt to settle the class lawsuit without following the protections of court review found in F.R.Civ.P. 23(e).

■ Assuming that the filing of a class action against various non-debtors affords the class plaintiffs some representational status in an earlier filed chapter 11 proceeding initiated by a non-defendant when the class plaintiffs have failed to comply with Bankr.R. 2019, *but see Matter of GAC Corp.,* 681 F.2d 1295, 1299 (11th Cir.1982) (discussing former Rule 10–211 from which Rule 2019 is in part derived); *In re Electronic Theatre Restaurants Corp.,* 57 B.R. 147 (Bankr.N.D. Ohio 1986), the objectors' position is still unsound. First, confirmation of this plan will not dismiss or settle the class action suit. The non-releasing partners are free to press that action, and to seek class certification for all remaining class members. Defendants in a class suit are permitted to reach an accord with non-representational class plaintiffs and such accord is outside the scope of Rule 23(e). *See In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1138–1141 (7th Cir.), *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979);[6] *Rodgers v. United States Steel Corp.,* 70 F.R.D. 639 (W.D.Pa.), *appeal dismissed,* 541 F.2d 365 (3d Cir.1976); 3B *Moore's Federal Practice,* ¶ 23.80[1] (2d ed. 1988). Second, the policy considerations inherent in Rule 23(e) are not implicated by these releases. *In re General Motors Corp. Engine Interchange Litigation.* And third, the objectors are ignoring the provisions of F.R.Civ.P. 23(c)(2).

The class action was brought under Rule 23(b)(3). That means that putative class members may elect to opt out of the class under rule 23(c)(2). In essence, that is what the releasing limited partners have chosen to do, in return for contributions from general partners and concessions from secured creditors which may enable a foreclosure on the real estate to be avoided. *See Cada v. Costa Line, Inc.,* 93 F.R.D. 95, 98 (N.D.Ill.1981). While no limited partner may be compelled to grant a release or opt out under such terms, no non-releasing limited partner has the ability to prevent the exercise of such an election simply because it is a named plaintiff in a putative class action.

In sum, a majority of the class of limited partners favor the proposed plan and favor tendering requested releases. The fact that in so doing they are agreeing to receive less than those partners who refuse to tender releases is no basis to deny confirmation. While this result may reduce the potential recovery of the pending district court litigation, and thereby reduce the negotiating leverage of the objecting limited partners, those objecting partners cannot veto the releases.

### III.

■ The objectors also contend that the proposed plan is not in "good faith" and so fails to comply with 11 U.S.C. § 1129(a)(3). As I noted in *In re Haardt,* 65 B.R. 697, 703 (Bankr.E.D.Pa.1986), the concept of a good faith plan is not well defined but is generally viewed as having at least two components. It must be "proposed 'with honesty and good intentions' and 'with a basis for expecting that a reorganization can be effected.'" *In re Koelbl,* 751 F.2d 137, 139 (2d Cir.1984), *citing Manati Sugar Co. v. Mock,* 75 F.2d 284, 285 (2d Cir. 1935). The objectors contend separately that the proposed plan is not feasible and this issue will be discussed below. Here, I shall simply conclude that there was no evidence to suggest that the debtor has

---

**6.** The concerns noted by the Seventh Circuit regarding communication to individual class members, 594 F.2d at 1139–40, are adequately addressed by the disclosure statement requirements established in this case by 11 U.S.C. § 1125. Moreover, there was no objection lodged against the instant disclosure statement.

offered a plan without some reasonable belief that it can succeed. It has produced projected cash flows showing that the income derived from the apartment complex, when supplemented with general partner contributions, is sufficient to meet its plan obligations. Moreover, the income projections were undertaken by an individual with a background in the field of management and operation of residential apartment buildings in the Orlando area.

In addition, the debtor has negotiated reductions in the secured debt, provided for the retention of limited partnership interests, and has on hand escrowed funds in excess of $200,000.00 to fulfill plan requirements. Therefore, regardless of whether the plan is ultimately viewed as feasible, under 11 U.S.C. § 1129(a)(11), I do not view its submission as lacking in good faith. *See In re Elsinore Shore Associates,* 91 B.R. at 260–61; *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984). *See generally Tennessee Publishing Co. v. American Nat'l Bank,* 299 U.S. 18, 57 S.Ct. 85, 81 L.Ed. 13 (1936); *In re Haardt.*

■ The objectors argue, though, that the plan is in bad faith because the general partners will benefit more from its failure than from its success. They reason that the plan calls for four annual contributions from the general partners of up to $150,-000.00. Should the plan fail, they suggest, the general partners would be free of the duty to provide subsequent annual contributions while retaining the benefit of the bargain—the limited partner releases. Therefore, the objectors contend that the plan was not proposed with "honesty and good intentions." I disagree.[7]

As will be discussed below, the general partners need to pay $400,000.00 before the plan could be confirmed. At that point, the confirmed plan would be binding upon all parties, including the general partners, *see, e.g., In re Ruti–Sweetwater, Inc.,* 836 F.2d 1263 (10th Cir.1988), and they cannot simply choose not to further participate. If

they did so choose, an action may be brought by creditors or equity holders to enforce compliance with plan terms. *See In re Cinderella Clothing,* 93 B.R. 373, 379 (Bankr.E.D.Pa.1988). Therefore, the objectors must be suggesting something more subtle. They must envision that the income projections from the realty are significantly overstated so that any failure of the plan would not be attributable to the unwillingness of the general partners to tender their required contributions. If that were so, and I shall address that issue below, I would deny confirmation as the plan would be infeasible. The lack of good faith would add nothing to the analysis.

Finally, this argument concerning the good faith of the general partners contains assumptions that may not be legally correct. The objectors assume that if the confirmed plan is not substantially consummated, any action taken against the debtor by virtue of 11 U.S.C. §§ 1112(b)(7), (8) or 1144 will have no effect upon the voluntary releases. Moreover, they also assume that I have no power to correct any code inequities by virtue of sections 105(a) or 349. To now analyze whether these assumptions are correct under the rubric of "good faith" would result in such conjecture as to be inappropriate.

Of course the plan could call for greater amounts or less contingent contributions from the general partners. Of course there is no guarantee that this plan will succeed and foreclosure be avoided. Of course limited partners who have granted releases may not ultimately achieve more than if they had remained potential class members in the federal district court lawsuit. Those factors alone do not yield the result that the instant plan was proposed in bad faith; they mean simply there are no certainties in confirmation process—only probabilities. They mean that the negotiation process, which is a significant component in chapter 11 bankruptcies, yielded a less than perfect plan from the perspective of the objecting limited partners. Such

---

7. The Court at *In re Future Energy Corp.,* 83 B.R. 470, 487 (Bankr.S.D.Ohio 1988) recently held that an objector's unsupported suspicions that

required post-confirmation actions would not be taken was insufficient to demonstrate bad faith.

criticisms are not unique to this case, and they do not fall within the narrow confines of bad faith. Therefore, this objection shall also be denied.

### IV.

■ The last objection to confirmation is that the debtor's proposed plan is not feasible and so is in violation of 11 U.S.C. § 1129(a)(11).[8] The purpose behind the statutory requirement of feasibility is to "prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." 5 *Collier on Bankruptcy*, ¶ 1129.02, at 1129–36.11 (15th ed. 1988). *Accord Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985). Feasibility does not require that substantial consummation of the plan be guaranteed; rather, the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms. *See In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir.1985); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986). In order to evaluate the likelihood of successful confirmation of the proposed plan, courts generally consider factors such as capital structure, potential earnings, market conditions, and management capabilities. *See In re Elsinore Shore Associates*, 91 B.R. at 275; 5 *Collier on Bankruptcy*, ¶ 1129.02[a] (15th ed. 1988). At bottom, though, one must focus upon the specific terms of the plan in order to determine its plausibility. Here, those relevant plan terms are as follows.

■ The debtor is not proposing any distribution to partners and has no unsecured creditors. It does propose to make total debt service payments to its various lien holders: $580,000.00 during year one; $610,000.00 during year two; $665,000.00 during year three; $720,000.00 during year four; and, $62,083.34 per month for six months during year five. In addition, $200,000.00 was to be paid to the fourth mortgagee, Bound Brook Associates I, prior to the confirmation hearing, $50,000.00 is to be paid to mortgagees' counsel after confirmation, and approximately $100,-000.00 in administrative expenses (i.e. debtor's counsel fees) is to be paid upon the effective date of the plan.

The primary source of plan funding is to come from the net income derived from the operations of the Pacesetter Apartments. The debtor presented expert testimony from an individual who is involved in managing apartment buildings in the Orlando area. Upon analysis of the debtor's current and historical financial records, the condition of the apartment complex, the current occupancy rate and rental income, and an assessment of the short-term future market conditions for rental properties in the Orlando region, this expert projected net income expected to be derived from the realty in the next five years. In so doing, the expert made three significant assumptions: first, that a $200,000.00 capital improvement fund would be created; second, that the occupancy rate would improve by the end of the first year from 88% to 94%; third, that gross income would increase by 5% per annum in years 2 through 5 and operating expenses would increase by 4% per annum[9] over the same period. Based upon those assumptions, the expert projected net income from the property to be: $614,000.00 in year one; $619,540.00 in year two; $657,111.00 in year three; $696,-823.00 in year four; and $738,796.00 in year five.

The second source of plan funding is to be contributions from the general partners. The plan proposes that they place $200,-000.00 in a capital improvement fund—which they have already done. The plan proposes that they pay $200,000.00 preconfirmation to the fourth mortgagee—which

---

8. Subsection 1129(a)(11) states:
   (a) The court shall confirm a plan only if all of the following requirements are met:
   (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

9. This is imprecise. The expert applied the 4% increase to an expense number $30,000.00 greater than that projected for year one in order to adjust for the use of the $200,000.00 capital improvement fund during year one.

they have already done. The plan also proposes that they fund any plan payment shortfalls, to the extent net income from the property is insufficient, up to $150,000.00 per year.

Based upon the evidence presented, I conclude that the income assumptions are valid, the income projections reasonable, and the plan feasible. In reaching this conclusion, I reject the challenge of the objecting limited partners—a challenge largely focused upon the income projections.

Although the objectors offered no expert testimony of their own, they argue that the evidence offered by the debtor is faulty. They base their projections upon the gross income and expense incurred in 1988 and suggest that 1988 is the appropriate base from which to extrapolate. Such a suggestion overlooks two significant factors. First, the testimony was clear that the average occupancy rate in 1988 was only 88% while the occupancy rate just prior to the confirmation hearing had increased to 93%. Not only does this improvement support the expert's assumption that the occupancy rate would be at 94% during year one, but it also supports his use of income figures for year one greater than 5% above 1988 income. Second, the objectors ignore the effect on income and expenses to be achieved by the utilization of the capital improvement fund.[10]

The shortfall between required plan payments in year one, $580,000.00, plus debtor and mortgagee counsel fees, approximately $150,000.00, is compensated for by the net income, $614,000.00, the $150,000.00 funding commitment by the general partners, and the debtor's current cash on hand, approximately $50,000.00. In later years the cash shortfall becomes much less, if not non-existent.

Given my acceptance of the income projections, and given the general partners' tangible assurance[11] that their plan commitment will be funded, I thus conclude that the debtor's proposed plan is not visionary but is reasonably plausible and feasible. *See In re Monnier Bros.* Therefore, I shall deny this objection to confirmation.

V.

In sum, I consider all the objections to plan confirmation offered by ten non-releasing limited partners as unsustainable. In so doing, I do not in any way pass upon the merits of their suit in district court against the various non-debtor defendants. However, I do conclude that the existence of that lawsuit does not bar the confirmation of this plan.

As the plan proponent has demonstrated that all the requisite elements of 11 U.S.C. § 1129(a) have been met, an order granting confirmation shall be entered.

**10.** The objectors also challenge the credibility of this expert based upon his projection, at the request of the debtor's property manager, of income and expenses for the year 1988. Such a projection proved optimistic. However, I find credible Mr. Dalton's explanation that the 1988 projection was knowingly optimistic at the time made. He was asked to offer a "best case scenerio" or target budget given the limited funds for property maintenance. Therefore, I find no basis to discount his confirmation projections.

**11.** Evidence was presented that the $200,000.00 capital improvement fund was already held in escrow, that the $200,000.00 due to the fourth mortgagee was paid, and that the general partners have the financial ability to fulfill their obligation to pay, if necessary, up to $150,000.00 per year.