**In re PHOENIX PETROLEUM CO., Debtor.**

No. 00–17786F.

United States Bankruptcy Court, E.D. Pennsylvania.

June 6, 2001.

Doron A. Henkin, Philadelphia, PA, Justin K. Miller, Philadelphia, PA, for debtor.

Michael Bray, Clarksburg, WV, Brendan Collins, Washington, DC, Joshua W. Dobin, Miami, FL, John K. Fiorillo, West Chester, PA, Ronald E. Gold, Cincinnati, OH, Robert M. Greenbaum, Saul, Ewing, Remick & Saul LLP, Philadelphia, PA, James W. Hennessey, Philadelphia, PA, Thomas M. Herdelin, Archer & Greiner, P.C., Haddonfield, NJ, Douglas R. Melin, Findlay, OH, Patrick Murphy, Leonardtown, MD, Natalie D. Ramsey, Philadelphia, PA, Robert H. Rosenbaum, Riverdale, MD, C. Grigsby Scifres, Williams Mullen Clark, Virginia Beach, VA, Brian H. Smith, Elkins Park, PA, J. Kevin Watson, Jackson, MI, Paul R. Wiener, New York City, W. J. Winterstein, Jr., Philadelphia, PA, Roger T. Yokubaitis, Houston, TX, for creditors.

## MEMORANDUM

BRUCE I. FOX, Chief Judge.

The debtor, Phoenix Petroleum Co., has moved for court approval of its disclosure statement filed in connection with its proposed amended plan of reorganization. Three objections to court approval of this disclosure statement remain.[1] First, a joint objection was filed by Warren Equities and Steaurt Investment Company, (successor in interest to Steaurt Petroleum Company). Next, the United States, on behalf of the Defense Energy Support Center (DESC), also filed an objection. Finally, PNC Bank, N.A. filed an objection, which simply incorporated the objections filed by the others.

These objectors all raise a similar concern, one that is less a disclosure issue than a confirmation issue. Nonetheless, these entities raise a matter which has

---

1. An objection was also filed by Wells Fargo Business Credit, Inc. That objection has been settled and the debtor has agreed to modify its disclosure statement. Therefore, what remains are the objections of three entities who contend that the disclosure statement must be further amended.

hovered over this case from its inception and, for reasons discussed below, may be addressed at this time.

The following uncontested facts are germane to this dispute.

## I.

### A.

Phoenix Petroleum, a Pennsylvania Subchapter S Corporation wholly owned by Stephen Wang, was incorporated in 1980 and is engaged in the business of supplying heating oil, gasoline and other petroleum products to its customers, primarily governmental entities and utilities.

On February 13, 1991, Phoenix filed its first chapter 11 case, docketed at Bankr. No. 91–10798. Among its 1991 creditors was the Defense Fuel Supply Center (now known as the Defense Energy Support Center, or DESC), which filed an unsecured proof of claim in that earlier case in the amount of $808,000.00. *See* Disclosure Statement, at 8 n. 1.

The debtor responded by filing an objection to this governmental claim. The parties agreed in January 1992 that the amount due the federal government on its asserted claim (if any) could be determined in a non-bankruptcy forum: the Armed Services Board of Contract Appeals ("ASBCA") (with the right of appropriate appeals therefrom). The United States also acknowledged owing the debtor at that time at least $317,003.53. The parties stipulated in January 1992 that the

amounts due from the United States could be offset against the allowed claim of the United States, once those amounts were determined. *See* Ex. F to Debtor's Motion to Reopen, ¶¶ 2–4.[2]

The debtor's proposed second amended chapter 11 plan of reorganization in its 1991 case was confirmed by an order dated September 18, 1992. In relevant part, under the terms of this approved plan, unsecured creditors would receive a *pro rata* distribution from a $1,000,000.00 fund derived primarily from a post-confirmation credit facility. This *pro rata* share would be held in reserve for all contested claims (such as the one held by the federal government) until the debtor's challenge was resolved. If the debtor's objection to a disputed claim were later sustained, then that creditor's portion of the reserved fund would be distributed to the remaining allowed unsecured creditors to increase their *pro rata* distributions. *See* Disclosure Statement, at 8; Ex. B to Debtor's Motion to Reopen.

The debtor asserts in this case that unsecured creditors received a distribution equal to 27.1% of their allowed claims in its 1991 case. Disclosure Statement, at 8. About $130,000.00 is still held in reserve due to the continuing litigation over the validity of the federal government's claim. *Id.*[3]

Article VIII of the 1992 confirmed plan provided that all claims held by the debtor against insiders or loan guarantors would be waived, and that the proceeds of certain

---

**2.** The parties referred to the exhibits attached to the debtor's motion to reopen that earlier bankruptcy case during the hearing on approval of the disclosure statement. As there is no challenge to the authenticity of those documents, I have considered them in connection with this dispute.

**3.** For purposes of this dispute it is important to note that unsecured creditors were not

paid in full during the prior 1991 case and would not be repaid in full even if the federal government's claim were disallowed and the entire $130,000.00 reserve were distributed to the remaining creditors. If the debtor distributed $870,000.00 (of the original $1 million) and repaid only 27.1% of claims, then the allowed claims totaled more than $3.2 million.

preference actions would be payable to creditors. Article VIII also provided that certain avoidance actions "and any and all other Claims owed to or in favor of the Debtor, are hereby reserved and retained for the enforcement by the Debtor ... and the proceeds thereof shall inure to the Debtor and or BBL [the post-confirmation lender, Bank Brussels Lambert] rather than to the Creditors receiving distributions hereunder."

Article XI of the 1992 approved plan stated that "upon Confirmation the Debtor shall be vested with all of the property of the estate, free and clear of all Claims and interests of Creditors, subject only to BBL's rights and liens...."

## B.

After confirmation of this plan and during the course of many years of litigation between Phoenix and the Defense Fuel Supply Center, Phoenix eventually brought suit in the United States Court of Federal Claims in 1995 alleging that it was underpaid by the federal government on a contract to provide jet fuel. Disclosure Statement, at 9. This claim—referred to by the parties as the "MAPCO claim," because a similar claim was successfully litigated in a case called *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 405 (1992)—was never disclosed by Phoenix in its earlier chapter 11 bankruptcy case in this district, which ended with a

final decree (under Fed.R.Bankr.P. 3022) on March 22, 1994. *See Phoenix Petroleum Co. v. United States*, 215 F.3d 1345 (Table), 1999 WL 521189, *1, 3 (Fed.Cir. 1999).

The debtor maintains that it was unaware of the existence of this claim until 1995. Disclosure Statement, at 9. The MAPCO claim, however, is based upon a contract which predated Phoenix's 1991 bankruptcy filing. In its MAPCO claim, the debtor seeks recovery of more than $2.2 million (with a potential recovery estimated by the debtor at more than $6 million). *See* Disclosure Statement, at 13, 31.

The Defense Energy Support Center opposed this 1995 litigation in the Court of Federal Claims on a number of bases: Among them was its assertion that Phoenix had no right to raise the MAPCO claim post-confirmation, given its non-disclosure of that claim during the 1991 bankruptcy case. *See generally Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). Relying upon decisions such as *WinMark Ltd. Partnership v. Miles & Stockbridge*, 345 Md. 614, 693 A.2d 824 (1997), the Federal Circuit Court of Appeals disagreed with the position of the DESC and held that Phoenix had the ability to raise this MAPCO claim post-bankruptcy. *Phoenix Petroleum Co. v. United States*.[4]

---

**4.** In *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355 (3d Cir.1996), the Third Circuit refused to bar a former chapter 11 debtor from prosecuting a claim which it did not disclose to creditors during its chapter 11 case. In so doing, the Court of Appeals distinguished its earlier decision in *Oneida* by noting that the chapter 11 debtor in *Oneida* "had knowledge of this potential claim at the time it filed for bankruptcy" as well as "had ample motive to conceal its claim." *Id.*, at 363. Thus, "there was ample evidence in the [*Oneida*] record from which

an inference of deliberate manipulation could be drawn." *Id.*, at 363. In contrast, the plaintiff in the *Ryan* litigation did not "deliberately conceal[ ] its claims against defendants from the bankruptcy court or otherwise [seek] to 'obtain ... unfair advantage' by its non-disclosure." *Id.*, at 364.

Here, there was no evidence that *Phoenix* was aware of its MAPCO claim during the pendency of its 1991 bankruptcy case. Thus, the Federal Circuit saw no reason to apply *Oneida* and bar the debtor from litigating that

The appellate court, however, was concerned that creditors who were not paid in full during Phoenix's 1991 bankruptcy case might have interests in the proceeds of this previously undisclosed claim. Therefore, while acknowledging Phoenix's right to prosecute this MAPCO claim post-bankruptcy, the Federal Circuit also sought to protect those creditor interests. The former debtor's ability to prosecute its MAPCO claim against the federal government was therefore given only conditional approval by the appellate court. The civil action was remanded by the Federal Circuit to the Court of Federal Claims with the directive that Phoenix could litigate its claim:

> ... so long as steps are taken to ensure that the claim does not remain free and clear of all claims and interests of the creditors. In our view, such an assurance would ensue most efficiently by ordering a stay of the proceedings so as to allow plaintiff to petition the bankruptcy court. In this way a windfall to the defendant would be prevented and all creditors would potentially benefit from the bankruptcy court's expertise in a readministration of newly found assets.... Moreover, a stay in the proceedings will preserve pendency of the claim so as to eliminate the possibility that technical defenses such as a time bar could arise were the case to be dismissed and then refiled with the bankruptcy court's permission.
> We have no reason to doubt that the Court of Federal Claims and the bankruptcy court can cooperate in fashioning the procedure that will permit Phoenix to pursue its case against the govern-

ment on its merits in the Court of Federal Claims, while at the same time satisfying the bankruptcy court that any award that Phoenix may attain in the litigation will be distributed correctly.

*Id.,* at *6 (citations omitted).

In response to this ruling, Phoenix sought to reopen its 1991 bankruptcy case. In connection with such a reopening, the debtor also sought approval from this bankruptcy court that all MAPCO litigation proceeds, if the debtor should prevail, would be payable solely to the debtor and to BBL, its post-confirmation lender. While there was no opposition to the reopening of the closed 1991 bankruptcy case, the debtor's proposed determination of the appropriate distribution of the MAPCO proceeds was challenged by the federal government and by certain unsecured creditors from that case.

By a memorandum and order dated April 7, 2000, I reopened the 1991 chapter 11 case solely to authorize the debtor to prosecute the MAPCO claim. I deferred, however, ruling on the entitlement of any party to the proceeds of the litigation until the lawsuit was concluded. (In order to avoid certain expenses which would accrue were the case to remain open during the pendency of the MAPCO litigation, I reclosed the 1991 case, but directed the parties to return to this court when the lawsuit in the Court of Federal Claims was resolved.)

### C.

Disposition of the potential MAPCO litigation proceeds became more contested when, on June 19, 2000, Phoenix filed its

---

claim post-bankruptcy. In light of the Third Circuit's decision in *Ryan,* I believe our Court of Appeals would have reached a similar result.

Therefore, the instant dispute in this bankruptcy court does not present a conflict be-

tween stare decisis and law of the case. *See generally Moore v. Valder,* 65 F.3d 189, 195 n. 9 (D.C.Cir.1995), *cert. denied,* 519 U.S. 820, 117 S.Ct. 75, 136 L.Ed.2d 35 (1996).

second chapter 11 case. Under the terms of its proposed amended reorganization plan, unsecured creditors holding allowed claims in the second bankruptcy case will be paid under two different scenarios, depending upon a decision by the debtor to continue its operations. Under either scenario, however, the debtor intends to distribute the proceeds of the MAPCO litigation, if any, to its creditors in its instant year 2000 bankruptcy case, as well as to BBL. Thus, the official committee of unsecured creditors in the 2000 chapter 11 case now asserts an interest in the MAPCO litigation.

Indeed, the debtor, joined by the Committee in this latest case, maintains that the earlier 1992 confirmed plan resulted in the discharge of all claims against the debtor, except those held by BBL, and the vesting of all assets in the debtor, subject only to the lien of BBL. Disclosure Statement, at 8. Thus, the debtor and the Committee contend that the potential MAPCO proceeds are property of the debtor's estate held free and clear of the claims of the 1991 creditors (except BBL). The objectors to the debtor's disclosure statement, however, all of whom are 1991 creditors (or successors in interest), maintain that the Federal Circuit has determined that these MAPCO proceeds are subject to their claims and cannot be distributed by the debtor to its current crop of creditors.

## II.

### A.

■ The climax of a chapter 11 case is the confirmation process. As part of that process, creditors and interest holders whose rights would be impaired are entitled to vote on any proposed plan. By virtue of 11 U.S.C. § 1125(b),[5] no plan may be submitted to these parties unless they receive an accompanying disclosure statement. *See, e.g., Kirk v. Texaco, Inc.,* 82 B.R. 678, 681 (S.D.N.Y.1988). A disclosure statement may only be approved after notice and hearing, Fed.R.Bankr.P. 3017(a), and then only if it includes "adequate information." 11 U.S.C. § 1125(b); *accord, e.g., Matter of Texas Extrusion Corp.,* 844 F.2d 1142, 1157 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988).

■ The phrase "adequate information" is defined by statute. It means:

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan . . .

11 U.S.C. § 1125(a)(1). Thus, it is understood that the general purpose of the disclosure statement is to provide "adequate information" to enable "impaired" classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan. *See, e.g., Century Glove, Inc. v. First American*

---

**5.** This subsection provides:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

*Bank of New York,* 860 F.2d 94, 100 (3d Cir.1988); *Oneida Motor Freight, Inc. v. United Jersey Bank; In re River Village Associates,* 181 B.R. 795, 804 (E.D.Pa. 1995); *In re Monroe Well Service, Inc.,* 80 B.R. 324, 330 (Bankr.E.D.Pa.1987).

■ The general language of the statute and its surrounding legislative history make clear that "[t]he determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court." *Matter of Texas Extrusion Corp.,* 844 F.2d at 1157; *accord, e.g., Kirk v. Texaco, Inc.,* 82 B.R. at 682:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection.

(quoting H.R.Rep. No. 595, 95th Cong, 1st Sess., 408–409 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6365).

An early Code decision produced general categories of information which should often be addressed within a disclosure statement. *In re Metrocraft Pub. Services, Inc.,* 39 B.R. 567, 568 (Bankr. N.D.Ga.1984).[6] Included among this list are the assets of the bankruptcy estate and their value. Nonetheless, it is also well understood that certain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case. *Accord, e.g., In re United States Brass Corp.,* 194 B.R. 420, 425 (Bankr.E.D.Tex. 1996); *In re Cardinal Congregate I,* 121 B.R. 760, 765 (Bankr.S.D.Ohio 1990).

■ Generally, "the adequacy of disclosure is dependent upon various factors including: the size and complexity of the chapter 11 case, the type of plan proposed, the type of creditors and claims impaired by the proposed plan, and the access by impaired creditors to relevant information from other sources." *In re Monroe Well Service, Inc.,* 80 B.R. at 330.

### B.

In this instance, the various objectors do not complain that the debtor has omitted necessary information in its disclosure statement regarding the debtor's assets. More precisely, they assert that the debtor has asserted erroneous information.

6. The bankruptcy court detailed the normal topics for inclusion in a disclosure statement as follows:

> Relevant factors for evaluating the adequacy of a disclosure statement may include: (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectibility of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

They note that the debtor's statement discloses that it proposes in its amended plan to distribute the proceeds of the MAPCO litigation as part of its 2001 reorganization. This, they argue, is not permitted. Further, they suggest, creditors should not be misled into voting for this plan based upon such faulty information. Accordingly, the objectors contend that the debtor is misinforming creditors by promising them a greater distribution than bankruptcy law will allow.

Of course, the disclosure statement accurately describes the debtor's proposed plan. Yet, if the debtor does intend, as part of the confirmation process, to distribute assets to creditors which it is not legally entitled to distribute, that issue could be raised as an objection to confirmation. Therefore, the objectors maintain that the debtor has proposed a plan that is fatally flawed and which could never be approved regardless of the outcome of voting on the plan.

■■■■ Courts generally have agreed that it may, on occasion, be appropriate to consider issues at the disclosure hearing stage which could otherwise be raised at confirmation, if the described plan is fatally flawed so that confirmation would not be possible:

> If the disclosure statement describes a plan that is so "fatally flawed" that confirmation is "impossible," the court should exercise its discretion to refuse to consider the adequacy of disclosures. *In re Cardinal Congregate I, supra,* 121 B.R. at 764; *In re Monroe Well Service, Inc.,* 80 B.R. 324 (Bankr.E.D.Pa.1987); *In re Pecht,* 57 B.R. 137 (Bankr.E.D.Va. 1986). Such an exercise of discretion is appropriate because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed. *See In re Pecht, supra.*

The question whether a plan meets requirements for confirmation is usually answered at confirmation hearings. *In re Unichem Corp.,* 72 B.R. 95, 98 (Bankr.N.D.Ill.1987) [, *aff'd,* 80 B.R. 448 (N.D.Ill.1987) ]. Where the plan's inadequacies are patent, they may, and should be addressed at the disclosure statement stage. *Id.* Disclosure hearings anticipate, but do not preempt, confirmation hearings. *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 980 (Bankr. N.D.N.Y.1988). Accordingly, the disclosure statement should be disapproved at the threshold only where the plan it describes displays fatal facial deficiencies or the stark absence of good faith. *See In re Dakota Rail, Inc.,* 104 B.R. 138, 144 (Bankr.D.Minn.1989); *In re Unichem Corp., supra.*

*In re Eastern Maine Elec. Co-op., Inc.,* 125 B.R. 329, 333 (Bankr.D.Maine1991); *accord, e.g., In re Curtis Center Ltd. Partnership,* 195 B.R. 631, 638 (Bankr.E.D.Pa. 1996); *In re United States Brass Corp.,* 194 B.R. at 422.

Here, all parties have urged me to consider this issue at the disclosure statement stage. All interested parties have had the opportunity to address the adequacy of the debtor's disclosures concerning the MAPCO litigation, including creditors from Phoenix's first bankruptcy case.

In April, 2000, it had been my intention to refrain from rendering any determination regarding the MAPCO proceeds until that lawsuit had concluded. The filing of Phoenix's second chapter 11 case now makes such a continued delay unwise.

The latest group of Phoenix creditors will have their rights affected by this second reorganization case. To defer the administration of that case until the debtor's MAPCO litigation is completed may have

adverse consequences for those creditors. Without question, such a delay will increase the expenses incurred by the bankruptcy estate. *See, e.g.*, 28 U.S.C. § 1930(a)(6). Moreover, Phoenix and its sole shareholder need to make certain decisions regarding continued business operations which are intertwined with this reorganization.

In connection with the disclosure statement hearing, I directed the debtor to provide notice to all potentially affected parties, including the 1991 creditors.[7] Counsel to the former creditors' committee in that 1991 case participated in the hearing as attorney for two earlier creditors. PNC Bank, as successor to a 1991 creditor, also participated. The United States, which asserts that it is still a creditor of Phoenix, was active at the disclosure statement hearing through its counsel. Counsel for the Official Committee of Unsecured Creditors in the 2000 bankruptcy case also participated. Wells Fargo, which has an intercreditor agreement with BBL, was represented at the hearing. Finally, the United States trustee was afforded the opportunity to offer her views on the matter.

Thus, I am confident that all possible viewpoints regarding the MAPCO proceeds either have been or could have been expressed. Accordingly, in order to advance the administration of this case for the benefit of all parties, I shall now resolve an issue that permeates this case and, although a confirmation issue, would not be affected by creditor voting.

### III.

#### A.

In its objection to the disclosure statement, DESC contends that it "is entitled to set off any money owed to Phoenix against the DESC's prepetition claims [in the 1991 case]. The DESC has now established in excess of $690,000 in such prepetition claims. Accordingly, the Debtor's Disclosure Statement should reflect that the DFSC Receivable referred to in the Debtor's Plan of Reorganization and Disclosure statement, and any recovery resulting from the MAPCO litigation is the subject of DESC's set off rights and is not available for distribution to creditors in this bankruptcy [sic]." Objection of United States, at 5.

The joint objection filed by Warren Equities, Inc. and Steaurt Investment Co. asserts that the $1 million distribution reserve established for unsecured creditors in the 1992 reorganization plan was based upon an analysis of the debtor's disclosed assets. "Had the existence of the 'Mapco litigation' been disclosed, the appropriate value would have been added to the liquidation analysis and allocated to the 'pot' payable to general unsecured claims … and the payout to unsecured creditors would have been increased accordingly." Objection, ¶ 2. These objectors further maintain that the undisclosed MAPCO claim "remains in the 1991 estate, subject to the claims of creditors in that case." Objection, ¶ 7. These two objectors also contend that the MAPCO claim was never validly encumbered by BBL. Objection, ¶ 8. Finally, both the United States and these objectors argue that the 1999 decision of the Federal Circuit Court of Appeals in mandates the conclusion that the MAPCO proceeds belong solely to the 1991 creditors.[8]

The debtor and the official creditors' committee in this 2000 chapter 11 bank-

---

7. Indeed, the Disclosure Statement mentions that at least two creditors from the 1991 case have filed proofs of claim in the 2000 case. Disclosure Statement, at 28.

8. The objection of PNC Bank to the debtor's disclosure statement merely incorporates the arguments made by the other objectors.

ruptcy case counter by reference to the language of the confirmed plan quoted earlier. They maintain that the plan in Articles VIII and IX clearly provided that the debtor would be vested with all litigation claims except those identified as belonging to the creditors. They also suggest that the disclosure statement accompanying that plan referred to a potential wrongful contract termination claim against the federal government—albeit not the MAPCO claim—which was not valued. Accordingly, these parties maintain that unsecured creditors in 1992 knew or should have known that the debtor might hold a valuable claim against the United States and that the proceeds of such a claim would not be paid to them. Thus, based upon 11 U.S.C. §§ 1141(b), (c) they assert that the proceeds of the MAPCO litigation are part of the debtor's estate in its 2000 case only, subject solely to whatever lien BBL may validly hold, but not subject to any claims of the 1991 creditors.

### B.

An initial issue which should be addressed concerns the binding nature, if any, of the decision of the Court of Appeals for the Federal Circuit in *Phoenix Petroleum Co. v. United States.* The United States argues that in this 2000 chapter 11 bankruptcy case the earlier decision issued by the Federal Circuit is the "law of the case governed by the mandate rule." Objection, at 7. For the following reasons, I disagree.

In general, "[t]he law of the case doctrine is a prudential principle that 'precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided.'" *Field v. Mans,* 157 F.3d 35, 40 (1st Cir.1998) (quoting *Cohen v. Brown University,* 101 F.3d 155, 167 (1st Cir.1996), *cert. denied,* 520 U.S. 1186, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997)). A component of this general doctrine[9] is referred to as the "mandate rule," which "instructs an inferior court to comply with the instructions of a superior court on remand." *Id.,* at 40; *accord Casey v. Planned Parenthood of Southeastern Pennsylvania,* 14 F.3d 848, 856 (3d Cir.1994).

As one court has explained:

The mandate rule is an application of the law of the case doctrine which applies when a higher court has passed on an issue or issues and then remanded the matter for further proceedings in the lower court. "It is well-established that a district court must adhere to the mandate and the law of the case as it is established on appeal." *Taylor v. United States,* 815 F.2d 249, 252 (3d Cir. 1987). The mandate rule acts to " 'preclude a re-examination of issues of law decided on appeal, explicitly or by necessary implication, either by the district court on remand or by the appellate court in a subsequent appeal.'" *Marine Overseas Services [, Inc.] v. Crossocean Shipping [Co., Inc.],* 791 F.2d 1227, 1232 (5th Cir.1986) (quoting, *Chapman v. NASA,* 736 F.2d 238, 241 (5th Cir.1984)

---

**9.** Although many decisions refer to the "mandate rule" as a subset of the broader "law of the case doctrine," that reference may be inexact. *See* Coquillette, *et al.,* 18 *Moore's Federal Practice 3d,* § 134.23[1], at 134–58 (2000). Application of the "law of the case" principle is not absolute as a court has the discretionary power not to adhere to a previous legal conclusion it reached earlier in the same case. *See, e.g., Eckell v. Borbidge,* 114 B.R. 63, 68 n. 5 (E.D.Pa.1990). In contrast, application of the "mandate rule" is "nondiscretionary." Coquillette, *et al.,* 18 *Moore's Federal Practice 3d,* § 134.23[1], at 134– 58 (2000). A trial court has no authority upon remand to deviate from the legal conclusions reached by an appellate court.

[, *cert. denied,* 469 U.S. 1038, 105 S.Ct. 517, 83 L.Ed.2d 406 (1984) ] ).

*Turner v. Avery,* 198 B.R. 192, 195 (E.D.La.1996), *aff'd without op. sub nom. Matter of Avery,* 109 F.3d 765 (5th Cir. 1997).

■■■■ Based upon the "law of the case" doctrine, after remand, a trial court must proceed in compliance with the "letter and spirit" of the appellate decision, "taking into account the appellate court's opinion and the circumstances it embraces." *Kilbarr Corp. v. Business Systems Inc., B.V.,* 990 F.2d 83, 87–88 (3d Cir.1993). It applies to every issue decided by the appellate court. *See Casey v. Planned Parenthood of Southeastern Pennsylvania,* 14 F.3d at 857:

> The mandate rule applies, however, only to those issues that were decided by the appellate court. [*In re*] *Sanford Fork & Tool,* 160 U.S. at [247] 256, 16 S.Ct. [291] at 293[, 40 L.Ed. 414 (1895)]. On remand, a trial court is free to "make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision." *Bankers Trust Co. [v. Bethlehem Steel Corp.],* 761 F.2d [943] at 950 [3d Cir. 1985]. "[I]t may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." *Id.*

■■■ The constraining effect of the mandate rule applies with equal force in appeals from bankruptcy court decisions which result in remands. *See, e.g., In re Main, Inc.,* 1999 WL 689715, \*12 (E.D.Pa. 1999) ("This finding by the bankruptcy court was not inconsistent with the mandate of the district court and thus was not precluded by the doctrine of law of the case") (citing *Casey*); *In re Mazzocone,* 200 B.R. 568, 572 (E.D.Pa.1996); *In re Kool, Mann, Coffee & Co.,* 233 B.R. 291, 309 (Bankr.D.N.J.1999).[10]

While I appreciate the force of the "mandate rule" as binding upon bankruptcy courts, the assertion of this principle by the United States in this instance overlooks the context within which the Federal Circuit ruled. That appellate court heard an appeal from the entry of summary judgment issued against the debtor by the Court of Federal Claims. *Phoenix Petroleum Co. v. United States,* 1999 WL 521189, \*1. Upon review, the Federal Circuit reversed and remanded the matter back to the trial court. The mandate that was issued by Federal Circuit Court upon remand was addressed to the Court of Federal Claims, not to this bankruptcy court. That follows because the present dispute arises in the context of a "case" different from that within which the Federal Circuit made its ruling.

I also recognize that a bankruptcy court has no authority to review any decisions validly entered by a District Court or a Court of Appeals. *Accord Teachers Ins. and Annuity Ass'n of America v. Butler,* 803 F.2d 61, 66 (2nd Cir.1986) ("[T]he bankruptcy court should not permit the

---

**10.** Some courts have suggested that there may be exceptions to the application of the mandate rule. *See generally Local 159, 342, 343 & 444 v. Nor–Cal Plumbing, Inc.,* 189 F.3d 473 (Table), 1999 WL 547400, \*2 (9th Cir.1999), *cert. denied sub nom. Pettit v. Bay Area Pipe Trades Pension Trust Fund,* 528 U.S. 1156, 120 S.Ct. 1163, 145 L.Ed.2d 1074 (2000). Whether such exceptions would be permitted in this circuit is doubtful. *See* Rus-

sell, *Bankruptcy Evidence Manual,* § 66, at 281 (2001) ("It is questionable whether the exceptions apply to the mandate rule in the Third Circuit") (quoting *Casey v. Planned Parenthood of Southeastern Pennsylvania,* 14 F.3d at 856); *see generally Todd and Co., Inc. v. S.E.C.,* 637 F.2d 154, 157 n. 4 (3d Cir.1980) (declining to decide whether there was an exception to the law of the case doctrine by an appellate court).

partnership to relitigate issues already decided by [District] Judge Weinfeld, for to allow the partnership to do so, when it knew of the judgment before it filed for bankruptcy, would result in its slipping arguments through the backdoor that had already been turned away at the front door .... allowing relitigation in the bankruptcy court would subvert the intent of 28 U.S.C. § 1294(1) (1982) which provides that appeals from district court decisions are to be heard by the court of appeals for the circuit that embraces the district"). Thus, to the extent the Federal Circuit established the existence of rights or claims by and against the United States and Phoenix Petroleum, that ruling binds those two parties and preclusion principles are applicable in this later filed bankruptcy case.

Nonetheless, the issue posed by the instant motion involves the competing rights of creditors from the debtor's 1991 bankruptcy filing and 2000 bankruptcy filing— none of whom were parties in the litigation initiated in the Court of Federal Claims. *Cf. Hudgins v. Davidson,* 127 B.R. 6 (E.D.Va.1991) (bankruptcy trustee, as representative of all creditors, was not precluded from raising a claim against the debtor by the outcome of litigation involving one creditor and the debtor). The precise question posed herein is whether the 1991 unsecured creditors have any rights to receive distributions if the debtor is successful in prosecuting its MAPCO claim against the United States, given the debtor's subsequent bankruptcy filing, and whether the United States may assert any setoff rights. In contrast, the narrow issue decided by the Federal Circuit Court was whether the debtor had any standing to prosecute such a claim and was the debtor estopped from doing so. The appellate court did not attempt to decide how potential proceeds should be distributed;

nor could it have anticipated the debtor's second bankruptcy filing.

In these circumstances, I cannot conclude that the earlier decision of the Federal Circuit Court "mandates" a particular outcome of the present motion. *See also In re Continental Airlines, Inc.,* 236 B.R. 318, 322 (Bankr.D.Del.1999) (mandate rule did not govern issues not resolved on appeal). Nonetheless, its thoughtful decision is entitled to deference and I shall make every effort to harmonize my conclusions with the analysis reached in that decision. *Cf. Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 816–17, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (even if a court has the power to revisit issues ruled upon by a coordinate court, it should be "loathe" to do so).

## C.

■ Not only must my disposition of the objections raised to the debtor's disclosure statement take into account the decision rendered by the Federal Circuit Court, I must also recognize the provisions of 11 U.S.C. §§ 1127(b) and 1144. The former statutory provision precludes the modification of a confirmed chapter 11 plan once "substantial consummation" of that plan has occurred. *See generally In re Continental Airlines,* 91 F.3d 553, 570 (3d Cir.1996) (en banc) (Alito, J. dissenting), (§ 1127(b) "dramatically curtails the power of a bankruptcy court to modify a plan of reorganization after its confirmation and 'substantial consummation' "), *cert. denied sub nom. Bank of New York v. Continental Airlines, Inc.,* 519 U.S. 1057, 117 S.Ct. 686, 136 L.Ed.2d 610 (1997). Given the distributions made by Phoenix in conformity with its 1992 plan, the terms of that plan cannot now be modified. *See generally* 11 U.S.C. § 1101(2) (defining the phrase "substantial

consummation"); *In re BNW, Inc.,* 201 B.R. 838, 845–46 (Bankr.S.D.Ala.1996).

Section 1144 bars the revocation of the confirmation order beyond 180 days from its entry. *See In re Emmer Bros. Co.,* 52 B.R. 385, 391 (D.Minn.1985). That deadline has long since passed.

 In addition, I also appreciate that "confirmed bankruptcy plans of reorganization are binding contracts that must be interpreted in accordance with applicable contract law." *In re Sugarhouse Realty, Inc.,* 192 B.R. 355, 362 (E.D.Pa.1996); *accord, e.g., In re UNR Industries, Inc. v. Bloomington Factory Workers,* 173 B.R. 149, 156–57 (N.D.Ill.1994). In certain instances, state law permits a contract to be "reformed." *Restatement of Contracts 2d,* § 155 (1981). Reformation, in general, is only appropriate when the contract fails to express the parties' actual agreement due to a mutual mistake:

> It is a well-known general rule that where parties have come to a mutual understanding as to the terms to be embodied in a proposed written contract or conveyance, and the writing executed is at variance with that understanding, it will be reformed to express their intention.

*Broida, in Own Right and for Use of Day, v. Travelers' Ins. Co.,* 316 Pa. 444, 447, 175 A. 492 (1934); *accord, e.g., In re Mellinger's Estate,* 334 Pa. 180, 185, 5 A.2d 321 (1939); *In re White Beauty View, Inc.,* 81 B.R. 290, 292 (Bankr.M.D.Pa.1988).

Thus, even if I assume that "reformation" of a confirmed plan is possible, despite section 1127(b), *see generally In re Victory Markets, Inc.,* 221 B.R. 298, 305 (2nd Cir. BAP 1998) (discussing the possibility of reformation but rejecting its application on the facts presented), there would be no basis to "reform" the 1992 confirmed plan.

For purposes of this dispute, I accept that neither the debtor nor its creditors were aware at the time of confirmation hearing on the 1992 plan that Phoenix held a potential prepetition MAPCO claim. Their lack of knowledge was mutual. To the extent this lack of information is deemed a mutual mistake in the context of drafting the debtor's 1992 reorganization plan, there is no basis at present for me to conclude what terms the parties would have accepted as part of a reorganization plan had knowledge of that claim then existed. Two of the objectors simply maintain that, had creditors known of the claim, there would have been negotiations to increase the amount of the pool beyond the $1 million which was made available for distributions to creditors. Since those negotiations never took place, reformation is not now possible. *See generally Dudash v. Dudash,* 313 Pa.Super. 547, 554, 460 A.2d 323 (1983); *Youngstown Electric Light Co. v. Butler County Poor Dist.,* 21 Pa.Super. 95, 1902 WL 3842, *3 (1902):

> When it is said that equity will reform a written agreement so as to express and carry out the intention of the parties, the intention meant is the intention of both parties as to something upon which their minds actually met. It seems clear, therefore, that the case is not one in which a reformation of the instrument, by increasing the price to be paid, or by substituting the plans and specifications prepared by the plaintiff's engineer for the plans and specifications adopted and approved as aforesaid and attached to and made part of the contract, would be warranted. To thus decree would be to hold the defendant to a contract which the commissioners did not intend to make, and to which they never assented.

## IV.

All parties ultimately refer to bankruptcy law principles for the resolution of their

dispute. I agree that the answer to this contest over the possible MAPCO proceeds lies with an interpretation of its various provisions.

### A.

■ I begin first with the position of DESC that it is entitled to a right of setoff from any MAPCO proceeds based upon 11 U.S.C. § 553.[11]

The exercise by a creditor of a right to setoff post-confirmation has not been accepted by all courts. *Compare In re De Laurentiis Entertainment Group, Inc.,* 963 F.2d 1269 (9th Cir.), *cert. denied sub nom. Carolco Television Inc. v. National Broadcasting Co., Inc.,* 506 U.S. 918, 113 S.Ct. 330, 121 L.Ed.2d 249 (1992) (allowing setoff post-confirmation in chapter 11) *with United States on Behalf of I.R.S. v. Norton,* 717 F.2d 767 (3d Cir.1983) (disallowing setoff post-confirmation in chapter 13).

Recently, the Third Circuit Court of Appeals re-examined that issue in *In re Continental Airlines,* 134 F.3d 536 (3d Cir.); *cert. denied sub nom. United States v. Continental Airlines,* 525 U.S. 929, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998). In *Continental Airlines,* the Third Circuit instructed that a creditor who first asserts a right of setoff after confirmation of a plan loses that right as part of the reorganization process:

> Furthermore, allowing the Government under the facts of this case to come forward after the plan of reorganization has been confirmed and sua sponte decide that it has a valid set-off without timely filing a proof of claim and asserting the set-off in the reorganization proceedings, has a probability of disrupting the plan of reorganization. It may also

unnecessarily protract the bankruptcy proceedings and consume judicial resources. Furthermore, it is unfair to other creditors and the Debtors, and can conceivably undermine the plan of reorganization and the objectives and structure of the Bankruptcy Code.

*Id.,* at 542.

■ Conversely, a creditor does not lose its setoff rights when it properly asserts that right prior to confirmation: "To summarize, we reaffirm the ruling in *Norton* and hold that the right of a creditor to set-off in a bankruptcy reorganization proceeding must be duly exercised in the bankruptcy court before the plan of reorganization is confirmed; the failure to do so extinguishes the claim." *Id.,* at 542.

Here, the debtor and the United States entered into an agreement prior to confirmation which, *inter alia,* recognized the government's setoff rights post-confirmation. *See* Ex. F, Motion to Reopen, ¶¶ 2–4. Moreover, the stipulation required the government not to oppose confirmation of the debtor's proposed second amended plan of reorganization (which was later confirmed), *id.,* ¶ 5, and granted that creditor relief from the bankruptcy stay to pursue its claims in a non-bankruptcy forum. *Id.,* ¶ 8. Thereafter, the parties acted in conformity with the terms of their agreement.

Since the United States diligently asserted its setoff rights pre-confirmation and entered into an agreement with the debtor which, in part, recognized those rights in return for the government's support of Phoenix's reorganization plan, I conclude that confirmation of that plan did not extinguish the right to setoff. Thus,

---

**11.** At oral argument, I believe debtor's counsel conceded that the government's right of setoff exists subject to certain qualifications.

As counsel for the creditors' committee did not focus on this issue at the hearing, I do not consider the debtor's concession dispositive.

the debtor's proposed disclosure statement must be amended accordingly.[12]

### B.

 Next, three creditors who held unsecured prepetition claims against Phoenix during its 1991 bankruptcy case contend that they have a right to receive distributions from any MAPCO claim proceeds. For the following reasons, I agree with their position, at least in part. I disagree, however, with their assertion that the unsecured creditors from the 1991 case have an exclusive right to distribution from those proceeds.

 In a chapter 7 context, by virtue of 11 U.S.C. § 554(c),[13] if a bankruptcy trustee fails to administer estate property then that property is abandoned back to the debtor when the case is closed. *See generally, e.g., Wissman v. Pittsburgh Nat. Bank,* 942 F.2d 867, 873 (4th Cir. 1991). By its terms, however, section 554(c) only applies to property of the estate which has been "scheduled" by the debtor and which the trustee elects not to administer.

In a related vein, section 554(d) provides that property that is neither abandoned by the trustee nor administered remains property of the estate. The provisions of section 554(d), read together with section 554(c), yield the result that property which is not listed on a debtor's schedules (and therefore not administered by a bankrupt-

cy trustee due to lack of knowledge) is never abandoned, not even when the case is closed. *Accord, e.g., In re Pace,* 146 B.R. 562, 566 (9th Cir. BAP 1992) ("The fact that the malpractice claim was not scheduled excluded it from the language of the court's order and the claim remained property of the estate in accordance with § 554(d)"); *Krank v. Utica Mut. Ins. Co.,* 109 B.R. 668 (E.D.Pa.), *aff'd without op.,* 908 F.2d 962 (3d Cir.1990).

The policy behind section 554(d) was well articulated by the Supreme Court in a pre-Bankruptcy Code decision:

> But that doctrine [of abandonment] can have no application when the trustee is ignorant of the existence of the property, and has had no opportunity to make an election. It cannot be that a bankrupt, by omitting to schedule and withholding from his trustee all knowledge of certain property, can, after his estate in bankruptcy has been finally closed up, immediately thereafter assert title to the property on the ground that the trustee had never taken any action in respect to it. If the claim was of value (as certainly this claim was, according to the judgment below), it was something to which the creditors were entitled, and this bankrupt could not, by withholding knowledge of its existence, obtain a release from his debts, and still assert title to the property.

---

12. I appreciate that there remains a dispute over the allowance of the government's claim; there may also be a dispute over the government's assertion of a common law right of setoff. Without now deciding those issues, I do conclude that creditors should be aware that the United States asserts a right of setoff in the MAPCO proceeds, the amount of the government's alleged claim, and that its right to setoff, if it exists under common law, was not extinguished by the earlier confirmed plan. This will assist creditors in valuing the MAPCO claim, and may influence their deci-

sion whether to support a plan which provides for distributions to them from the proceeds of this pending litigation.

13. Subsection 554(c) states:

(c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

*First Nat. Bank v. Lasater*, 196 U.S. 115, 118–119, 25 S.Ct. 206, 49 L.Ed. 408 (1905) (addressing the issue under the former Bankruptcy Act of 1898).

■ Accordingly, in a chapter 7 case, property of the estate of which the bankruptcy trustee has no knowledge remains estate property even after the bankruptcy case is closed. Further, upon the later discovery of the debtor's interest in that property, it may be appropriate to reopen the case in order to permit the trustee to administer those assets for the benefit of creditors. *See, e.g., Miller v. Shallowford Community Hosp., Inc.*, 767 F.2d 1556 (11th Cir.1985); *In re Arboleda*, 224 B.R. 640, 644–45 (Bankr.N.D.Ill.1998); *In re McCoy*, 139 B.R. 430 (Bankr.S.D.Ohio 1991).

In this dispute, the objecting creditors argue for this result. The MAPCO claims was never disclosed by Phoenix during its earlier bankruptcy case. Therefore, it was never administered and, according to them, remains property of the chapter 11 estate in that earlier case, subject solely to the claims of the 1991 creditors. In so arguing, the objectors refer to *Stein v. United Artists Corp.*, 691 F.2d 885 (9th Cir.1982). An analysis of the *Stein* decision will demonstrate the strength and weaknesses of the objectors' contentions.

In *Stein*, the Ninth Circuit Court of Appeals held that the failure of the debtor to disclose the existence of an antitrust claim during a chapter XI reorganization caused that claim to remain as part of the bankruptcy estate after confirmation of the debtor's reorganization plan. This decision, however, was based upon the language of section 70(i) of the repealed Bankruptcy Act of 1898. *Id.*, at 889–90. That former statutory provision "provided that upon confirmation of an arrangement or plan in bankruptcy, 'title to the proper-

ty dealt with shall revest in the bankrupt or debtor.'" *Id.*, at 890.

The Ninth Circuit concluded (with reference to the policies established in *Lasater*) that an asset not disclosed in a chapter XI reorganization is not "dealt with" by a reorganization plan and so does not vest with the debtor after confirmation:

> We hold that in Chapter XI proceedings, "property dealt with" refers to property administered or listed in the bankruptcy proceedings and supervised by the bankruptcy court, and therefore only such property reverts to the bankrupt upon termination of the bankruptcy proceedings.

*Id.*, at 893.

Were the *Stein* holding applicable to the instant dispute then Phoenix would have no right within its present bankruptcy reorganization to make use of the MAPCO proceeds. Those proceeds could only be administered as property of the estate in the earlier chapter 11 case.

As I noted earlier, though, the *Stein* decision construed a provision of the former Bankruptcy Act. Some courts—in determining ownership of an undisclosed asset in a chapter 11 case under the current Bankruptcy Code—have relied upon the Stein holding without acknowledging that 11 U.S.C. § 1141(b) differs from its predecessor under the Act. *See SFC Valve Corp. v. Wright Mach. Corp.*, 105 B.R. 720 (S.D.Fla.1989); *In re Auto West, Inc.*, 43 B.R. 761, 764 (D.Utah 1984). The Federal Circuit in *Phoenix Petroleum v. United States*, 1999 WL 521189, *5–6 was not among them.

Section 1141(b) now states:

b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

As the court in *Greenheart Durawoods, Inc. v. PHF Intern. Corp.*, 1994 WL 652434 (S.D.N.Y.1994) recognized:

In *Stein*, the debtor failed to disclose a cause of action as an asset in proceedings under Chapter XI of the Bankruptcy Act. 691 F.2d at 888. The issue presented to the Ninth Circuit in Stein was the meaning of the phrase "property dealt with" under former § 70(i) of the Bankruptcy Act, 11 U.S.C. § 110(i) (1976), which provided that upon the confirmation of an arrangement or plan in bankruptcy "the title to the property dealt with shall revest in the bankrupt or debtor". *Stein*, 691 F.2d at 890. The Ninth Circuit held that the phrase "property dealt with [']refers to property administered or listed in the bankruptcy proceedings and supervised by the bankruptcy court, and therefore only such property reverts to the bankrupt upon termination of the bankruptcy proceedings.'" *Id.* at 893. Furthermore, the Circuit Court affirmed the District Court's holding that the plaintiff's assignor's (the debtor's) failure to list an antitrust claim in the Chapter XI proceedings prevented that asset from vesting in the plaintiff at the conclusion of the Chapter XI proceedings. *Id.* at 890–893. Since, however, § 1141(b) of the Bankruptcy Code, does not contain the language "property dealt with" and, in contrast, provides that all property of the estate vests in the debtor, *Stein* is inapplicable here.

*Id.*, at *3.

▮▮ Thus, the explicit language of section 1141(b) provides that all assets, *i.e.*, even undisclosed claims, which were property of the bankruptcy estate vest in the debtor after confirmation unless the confirmed plan or the order of confirmation state otherwise. *Accord, e.g., In re Troutman Enterprises, Inc.*, 253 B.R. 1, 6 (6th

Cir. BAP 2000) ("Applying the Act's terms, an undisclosed asset would not vest with the reorganized debtor because it was not 'dealt with' by the plan. However, under the plain language of the Bankruptcy Code, all property of the estate vests with the reorganized debtor").

Since neither the debtor's 1992 confirmed reorganization plan nor the confirmation order stated otherwise, after confirmation Phoenix's interest in the prepetition MAPCO claim revested in that debtor, despite Phoenix's lack of knowledge of the claim and its lack of disclosure to creditors. Thus, the objectors' arguments to the contrary are unpersuasive as they conflict with the explicit language of the statute. *See generally, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (the express language of the Code is controlling).

Reliance upon section 1141(b) does not end the inquiry, however. In *Phoenix Petroleum Co. v. United States*, at *5, the Federal Circuit cited to the *Greenheart* decision with its analysis of section 1141(b) but remanded the case nonetheless. The appellate court was correct to do so because it also recognized the effect of section 1141(c), and because of the limited consequence of a bankruptcy discharge.

By virtue of section 1141(d)(1), upon confirmation of its reorganization plan in 1992, Phoenix received a discharge of preconfirmation claims. *See In re Benjamin Coal Co.*, 978 F.2d 823, 826 (3d Cir.1992). In general, this discharge serves to enjoin creditors from seeking to recover on their claims against the debtor, but does not actually extinguish these obligations. The debts still exists, but creditors are disabled from enforcing their claims through actions against the debtor. *Accord, e.g., In re Sure–Snap Corp.*, 983 F.2d 1015, 1018

(11th Cir.1993); *see also First Fidelity Bank v. McAteer*, 985 F.2d 114 (3d Cir. 1993) (a creditor may recover the full amount of the original obligation from the debtor's insurer rather than the smaller "cram down" amount provided in the debtor's confirmed chapter 13 plan notwithstanding the discharge).

Section 1141(c) implicitly recognizes the nuances of the discharge by providing:

> Except as provided in subsections (d)(2) and (d)(3) of this section [by which the chapter 11 debtor does not receive a discharge] and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

■■■ Thus, if the chapter 11 debtor receives a discharge, then property "dealt with by the [confirmed] plan" is free from all creditor claims and interests unless the plan itself or the confirmation order provides otherwise. *See generally Matter of Penrod*, 50 F.3d 459, 462–63 (7th Cir.1995). Conversely, property not "dealt with by the plan" remains subject to the claims and interests of creditors, although the debtor may not otherwise be liable on those claims.

In interpreting the phrase "dealt with by the plan" found in section 1141(c), numerous courts have held that only property whose existence is disclosed to creditors can be considered as dealt with by the chapter 11 plan. For reasons of policy (similar to those concerns addressed in *Stein*), undisclosed property is not dealt with by the plan and so remains subject to the claims of pre-confirmation creditors. *Accord, e.g., Kunica v. St. Jean Financial, Inc.*, 233 B.R. 46, 52–53 (S.D.N.Y.1999); *Rosenshein v. Kleban*, 918 F.Supp. 98, 102 (S.D.N.Y.1996) ("Because undisclosed claims are not dealt with by the plan, they do not revert to the debtor free of the claims of creditors"); *Pako Corp. v. Citytrust*, 109 B.R. 368, 376 (D.Minn.1989); *In re Emmer Bros. Co.*, 52 B.R. at 394; *WinMark Ltd. Partnership v. Miles & Stockbridge*, 345 Md. at 629, 693 A.2d 824; *see also Cowans, 5 Bankruptcy Law and Practice*, § 20.32, at 315 (7th ed. 1998) ("If the debtor does not list an asset in the papers and does not provide for it in the plan, subsection (b) on its face would vest the property of the estate back in the debtor but subsection (c) would not free it of claims as there was no plan provision"); *cf. In re Tipton*, 118 B.R. 12, 14 (Bankr. D.Conn.1990) (the claim of a creditor who was not given notice of a bankruptcy filing is not "provided for" by a chapter 13 plan within the meaning of section 1328(a)).

The Federal Circuit decision in *Phoenix Petroleum* noted the construction of section 1141(c) found in decisions such as *Rosenshein* and *WinMark* in its remand decision. Again, I agree with its analysis. To the extent that the debtor's prepetition MAPCO claim was not disclosed to creditors, this asset would not be "provided for" by its plan and so would remain subject to the claims and interests of the 1991 creditors. At the same time, by virtue of section 1141(b), that claim would revest in the Phoenix and become its property after confirmation.

The Committee in this second bankruptcy case argues that the plan provision noting a general retention by the debtor of claims not otherwise assigned to creditors was sufficiently detailed to "provide for" the MAPCO claim and thus render it free from all creditor claims. This position, however, has been rejected by other courts, *see, e.g., Kunica v. St. Jean Financial, Inc.*, 233 B.R. at 56, and is unpersuasive.

Phoenix maintains—as it did before the Federal Circuit—that it had no knowledge of any MAPCO claim until 1995—three years after confirmation of its plan.

Furthermore, it now believes the value of the claim may be as much as six times the entire amount paid to unsecured creditors in its earlier plan.

■ It is counterintuitive to suggest that a reorganization plan would "provide for" such a material asset, the existence of which was completely unknown to its proponent. Further, given the disclosure requirements of a debtor in possession, *see Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d at 362, creditors have the right to expect that they are made aware of all potentially significant claims in favor of the estate. As a fiduciary of the estate, a debtor in possession in chapter 11 should actively investigate and disclose all assets of the estate. *See* 11 U.S.C. §§ 1106(a)(3), 1107(a). The Committee's position, if accepted, would encourage debtors in possession not to investigate potential claims because they could retain all unknown assets through the commonly used general retention provisions.

As noted by the Ninth Circuit in *Stein:*

If a debtor in possession were permitted to omit claims in bankruptcy and later assert title to them, there might be an inducement to do so, to the prejudice of creditors' interests. Such a rule would undermine the fiduciary status of the debtor in possession. Whether or not the failure to list the asset in the case before us was intentional, the opportunity for con-

cealment must be considered in formulating the proper general rule.

*Id.,* at 892.[14] *Cf. Lerman v. Joyce Intern., Inc.,* 10 F.3d 106, 113 (3d Cir.1993) ("The purpose of this doctrine [construing former section 70(i) as excluding undisclosed assets] is to prevent a debtor from defrauding its creditors by withholding knowledge of a valuable asset until after its debts have been discharged").

■ Moreover, even if the general retention plan provision may arguably be read as including the MAPCO claim, such a general statement in this instance is at best ambiguous concerning its intent to include unknown claims. As the drafter of the plan, any ambiguities in the plan must be construed against Phoenix. *See, e.g., In re Miller,* 253 B.R. 455, 459 (Bankr. N.D.Cal.2000).

Thus, I conclude, as did the Federal Circuit, that section 1141(c) preserves the claims of Phoenix's 1991 prepetition creditors to recover from the MAPCO claim, and they were not extinguished by the confirmation process in 1992.

## V.

Were Phoenix's 1991 bankruptcy filing a chapter 7 case, or were it a liquidating chapter 11 case, enforcement of the 1991 creditors' rights would be straightforward, absent this second bankruptcy filing. The 1992 plan, however, called for the reorganization of the debtor with its continued existence and with the right to use and retain various assets after confirmation. Thereafter, the debtor filed a second chapter 11 reorganization case.

---

**14.** In *Donaldson v. Bernstein,* 104 F.3d 547, 554 n. 3 (3d Cir.1997), the Third Circuit made this observation of the *Stein* decision in determining whether a bankruptcy trustee had standing to assert a claim against the debtor's shareholders after confirmation of a chapter 11 plan and after conversion to chapter 7:

The court decided *Stein* under the Bankruptcy Act of 1898 rather than under the current Bankruptcy Code ... but the principles in that case remain applicable.

As I mentioned earlier, one cannot now determine what portion of the MAPCO proceeds would have been earmarked for unsecured creditors, had this claim been disclosed in 1992. Indeed, one cannot now determine the value which would have been assessed to this intangible asset had its existence been known to creditors and the debtor. One must also recognize that other creditors may have bargained for a lien in the intangible assets of Phoenix. *See generally In re Emmer Bros. Co.* (post-bankruptcy lien creditor held an interest in an undisclosed asset). Moreover, the general creditors of Phoenix whose claims arose after confirmation of the 1992 plan also had some legitimate expectations, when their claims arose, that the unencumbered assets of the debtor would be available to repay them.

 At the present time, I need not resolve whether BBL or any other entity holds a lien in the potential MAPCO litigation proceeds. Nor need I now determine the relative priorities of parties in these proceeds. Instead, I conclude that Phoenix must provide adequate information in its disclosure statement that its interest in this asset is subject to the unpaid claims of its 1991 creditors who held allowed claims, as well being part of the debtor's present bankruptcy estate (since that claim revested in the debtor in 1992). Furthermore, these 1991 creditors remain "creditors" in this 2000 case, even though the debtor's personal liability has

been discharged. *See Johnson v. Home State Bank*, 501 U.S. 78, 84, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) ("Even after the debtor's personal obligations have been extinguished [by the debtor's bankruptcy discharge], the mortgage holder still retains a 'right to payment' in the form of its right to the proceeds from the sale of the debtor's property").[15]

An appropriate order shall be entered.

## ORDER

AND NOW, this 6th day of June, 2001, for the reasons stated in the accompanying memorandum, the debtor's proposed disclosure statement does not provide "adequate information" as required by section 1125 of the Code.

Accordingly, it is hereby ordered that the disclosure statement is not approved and the objections raised by Warren Equities and Steaurt Investment Company, the United States and by PNC Bank, N.A. are sustained in part. The debtor may amend its disclosure statement to adequately disclose the following information:

1. The potential right of the United States to setoff its claim, if any, against the possible proceeds of the MAPCO litigation; and

2. The right of creditors who held allowed unsecured claims in the 1991 bankruptcy case and who were not repaid in

---

**15.** I appreciate that my analysis yields the result that some creditors of Phoenix may look to only a certain asset for payment while other creditors may look to all of the debtor's assets. A similar result may arise in circumstances different from those in this chapter 11 case. For example, the Court in *Johnson v. Home State Bank* essentially held in the context of a "chapter 20" case—when the debtor files a chapter 13 case after obtaining a chapter 7 discharge—that the secured creditor may look only to its collateral for payment.

In addition, in an individual bankruptcy case involving entireties property, joint creditors may receive the proceeds of the entireties property, as well as the proceeds from individually owned property. Non-joint creditors may not be paid from the proceeds of entireties property. *See, e.g., In re Monzon*, 214 B.R. 38 (Bankr.S.D.Fla.1997); *In re Blair*, 151 B.R. 849 (Bankr.S.D.Ohio 1992), aff'd, 33 F.3d 54 (Table), 1994 WL 408192 (6th Cir. 1994).

full to seek recovery against the possible proceeds of the MAPCO litigation.

The debtor shall also amend its disclosure statement as agreed upon with Wells Fargo Business Credit, Inc.

It is further ordered that the debtor shall have until June 22, 2001, to file and serve upon the United States trustee, upon counsel to the Official Committee of Unsecured Creditors, as well as upon counsel to all parties who filed an objection this disclosure statement, an amended disclosure statement (along with any accompanying amended proposed chapter 11 plan). A hearing on the debtor's request to approve any such amended disclosure statement shall take place on July 9, 2001, at 11:00 A.M. in Bankruptcy Courtroom # 2, Robert N.C. Nix Federal Building & Courthouse, 900 Market Street, 2nd Floor, Philadelphia, Pennsylvania.